[No. S081791. May 20, 2002.]

DANA E. ZELIG, a Minor, etc., et al., Plaintiffs and Appellants.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

**COUNSEL**

Talcott, Lightfoot, Vandevelde & Sadowsky, Talcott, Lightfoot, Vandevelde, Sadowsky, Medvene & Levine, John D. Vandevelde, Melissa N. Widdifield, Stephen B. Sadowsky and Edward M. Medvene for Plaintiffs and Appellants.

California Women's Law Center, Susan Berke Fogel, Marci Fukuroda; Kelley & Kelley and Pamela Kelley for the Asian Pacific American Legal Center, Break the Cycle, the California National Organization for Women, California Women's Law Center, Coalition of Women from Asia and the Middle East, National Organization for Women Legal Defense and Education Fund, Shelter Against Violent Environments and Women Lawyers Association of Los Angeles as Amici Curiae on behalf of Plaintiffs and Appellants.

Douglas Devries; Bruce Broillet; Roland Wrinkle; Wayne McLean; Thor Emblem; Rick Simons; Ian Herzog; James Sturdevant; Harvey R. Levine; Leonard Sacks; Robert Steinbert; Mary E. Alexander; Joseph Harbison III; David Casey, Jr.; Thomas J. Stolpman; Lee-Ann Tratten; Lawrence Drivon; William D. Turley; Steven J. Kleifield; David Rosen; Moses Lebovits; Greene, Broillet, Taylor, Wheeler & Panish, Christine D. Spagnoli; Esner & Chang and Stuart Esner for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

De Witt W. Clinton and Lloyd W. Pellman, County Counsel, S. Robert Ambrose and Louis V. Aguilar, Assistant County Counsel, Dennis M. Gonzalez, Principal Deputy County Counsel; Manning, Marder & Wolfe, Manning & Marder Kass, Ellrod, Ramirez and Steven J. Renick for Defendants and Respondents.

Bill Lockyer, Attorney Genral, Margaret Rodda, Assistant Attorney General, Darryl Doke and Gordon B. Burns, Deputy Attorneys General, for State of California as Amicus Curiae on behalf of Defendants and Respondents.

Pollak, Vida & Fisher, Girard Fisher and Daniel P. Barer for 115 California Cities and California State Association of Counties as Amici Curiae on behalf of Defendants and Respondents.

Fred J. Hiestand for the Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Respondents.

**OPINION**

**GEORGE, C. J.**—In this case we determine whether plaintiffs—the minor children of a woman who was shot to death by her former husband in a Los Angeles courthouse—may state causes of action for negligence, negligent infliction of emotional distress, wrongful death, and violation of civil rights against defendants County of Los Angeles and Los Angeles County Sheriff's Department for the failure of those entities to provide adequate security against third party violence inside the courthouse. We conclude that the trial court properly sustained defendants' demurrer to the state law claims and to the cause of action that is based upon 42 United States Code section 1983 for the claimed violation of the decedent's civil rights. We therefore reverse the contrary judgment of the Court of Appeal.

I

Plaintiffs, bringing this action through their guardians, are the minor children of Eileen and Harry Zelig. Plaintiffs' first amended complaint named Los Angeles County, the Los Angeles County Sheriff's Department, Harry Zelig, and 10 unnamed persons as defendants.

On September 1, 1995, Eileen was murdered by her former husband, Harry, inside what was then called the Central Civil Courthouse in Los Angeles.[1] Lisa Zelig, then six years of age, witnessed her father shoot her mother in the chest at point-blank range. Eileen and Harry were in the courthouse for the purpose of attending a family court hearing regarding spousal and child support.

In their complaint, plaintiffs alleged that the following circumstances preceded this tragedy. Eileen and Harry separated in October 1993. Harry failed to comply with orders of the family court relating to spousal and child support, and Eileen sought redress in the family court on various occasions.

---

[1]The opinion of the Court of Appeal also refers to the courthouse as the Hill Street Courthouse. The facility recently was renamed the Stanley Mosk Courthouse, in honor of the late Associate Justice of the California Supreme Court.

Harry became verbally abusive toward Eileen. On at least three occasions prior to September 1, 1995, Eileen informed the bailiff in one department of the family court that she feared Harry and believed he might attack or kill her in the courthouse. On at least one prior occasion, the bailiff searched Harry for weapons before permitting him to enter the courtroom. Eileen also previously had provided the bailiff and a judge in the family court with copies of letters and telephone messages in which Harry threatened to kill her. Eileen had secured restraining orders that prohibited Harry from possessing or carrying any firearms, that ordered him to turn over his firearms to his lawyer, and that prohibited Harry from being "within 100 yards of any firearm" while in the presence of Eileen and the children.

On September 1, 1995, Eileen appeared in department 27, one of the courtrooms hearing family law matters at the Central Civil Courthouse. Eileen and Harry were directed to proceed downstairs to department 1A. As she reached the second floor of the building, Harry retrieved a loaded .38-caliber revolver that had been concealed in his clothing and shot Eileen in the chest at point-blank range. Their daughter Lisa witnessed the shooting. Eileen died soon thereafter.

As noted, plaintiffs brought an action against the county, the sheriff's department, Harry, and 10 unnamed persons designated as Does I to X. With respect to the Doe defendants, plaintiffs alleged that "Does I through V had the power and authority to make decisions regarding the expenditure of funds by defendants County and Sheriff's Department. Defendants Does I through V are named . . . in their individual and official capacities." It was further alleged that "Does VI through X [in their individual and official capacities] acted in concert with defendants County and Sheriff's Department." It was alleged that these 10 unnamed persons acted "under color, authority, and pretense of the statutes, ordinances, regulations, customs and usage of the State of California, Los Angeles County, and under authority of their offices," and that their acts were "done . . . in the execution and implementation of the official policy, practice and custom of defendants County and Sheriff's Department." Finally, it was alleged that "each of the Doe defendants was the agent or employee of defendants County or Sheriff's Department, and . . . acted within the scope of such agency or employment."

Plaintiffs further alleged that the county, the sheriff's department, and the Doe defendants "knew, or should have known, that defendant [Harry] Zelig had repeatedly threatened acts of violence against [Eileen Zelig] during the course of their divorce and child custody proceedings," and that they "knew and/or should have known that the inherently contentious and acrimonious

nature of family law matters in general frequently resulted in foreseeable volatile and often violent situations. Indeed, high ranking County officials, including County Board of Supervisors and Superior Court Judges were specifically aware of the likelihood that violence, including shootings, would occur in the Courthouse." In addition, plaintiffs alleged that defendants "knew or should have known that criminal trials are frequently held in the Hill Street Courthouse and that the presence of the defendants and witnesses involved in those trials, who are not searched and do not have to pass through metal detectors, create[s] a potentially dangerous and volatile situation."

Plaintiffs alleged that defendants had a general duty to protect litigants from "such dangerous conditions, as well as a specific duty to protect [Eileen] because of the special relationship" between her and the county and the sheriff's department. As a basis for this special relationship, plaintiffs alleged "1) Eileen was required to be in the Courthouse in order to litigate her spousal and child support claims in the Family Courts, 2) these defendants impliedly agreed to provide a reasonably safe and secure forum for Eileen and other litigants who paid fees to defendants, 3) these defendants made law-abiding persons with business in the Courthouse dependent on defendants for security by ordering that persons not introduce their own weapons into the Courthouse, and 4) these defendants made law-abiding citizens particularly vulnerable while in the Courthouse by depriving them of the ability to have weapons to protect themselves in the Courthouse." They also alleged that the county and the sheriff's department "assumed the duty of providing the sole legal forum in which Eileen could litigate her claims and Eileen was, in turn, dependent upon these defendants to take responsibility for the dangerous conditions which existed within the Courthouse."

Plaintiffs alleged that defendants violated their duty to protect Eileen, because they countenanced the dangerous condition of the courthouse "to the extent they allowed weapons into the courthouse, knowing that litigants, especially in the Family Courts, could be hostile and prone to violence, and once knowing the likelihood of danger to persons in the Courthouse, failed to take steps to prevent the danger." Defendants, it was claimed, "in contravention of their aforementioned duty and despite their creating and awareness of a dangerous condition . . . failed or chose not to implement reasonably adequate barriers or other safety measures in the Hill Street Courthouse, including, but not limited to, posting adequate disclaimers and warnings, installing metal detectors or inspecting persons entering the Hill Street Courthouse for weapons." It was further alleged that "[b]ecause of their failure to provide and use barriers and warnings and/or other measures designed to prevent the introduction of weapons into the Hill Street Courthouse, defendant Zelig was able to and did bring with him [i]nto the Courthouse a loaded .38-caliber revolver."

With respect to the 10 unnamed persons, plaintiffs alleged that "[t]he Doe employees [of the county and the sheriff's department] negligently failed to take sufficient measures to prevent defendant [Harry] from harming Eileen, including, but not limited to failing to provid[e] metal detectors or other safety measures to prevent the introduction of weapons into the Courthouse, failing to warn her about the lack of security at the Courthouse, [and] failing to notify the appropriate authorities of the danger to her."

Plaintiffs' first cause of action, brought against all defendants except Harry, was denominated one for wrongful death but was treated by the Court of Appeal as a claim that the county maintained the courthouse in a dangerous condition. Plaintiffs claimed that defendants had a duty to implement reasonable safety or security measures and deliberately and knowingly failed to do so, in violation of Government Code sections 815.2, subdivision (a), 815.6, and 835. They alleged that defendants' "failure to install barriers or other safety measures, including but not limited to the installation of metal detectors, the posting of warnings or the conducting of searches of persons entering . . . [the courthouse] created a dangerous condition of property." They asserted that the lack of safety measures proximately caused Eileen's death, and that her death was a reasonably foreseeable consequence of the failure to implement adequate security measures.

In their second cause of action based upon 42 United States Code section 1983, also brought against all defendants except Harry, plaintiffs alleged that defendants, acting under color of law, "negligently, recklessly, intentionally, and in bad faith deprived [Eileen] of her rights" under federal law in that they unreasonably failed to employ reasonable warning or security measures at the courthouse. They alleged that defendants had a special duty to protect Eileen, because she was required to litigate her support claims in the family court and therefore was required to rely upon defendants to protect her. They alleged that defendants acted with deliberate indifference to Eileen's rights, asserting that defendants' acts deprived Eileen "of her right to substantive due process under the Fourteenth Amendment, by depriving her of a) her liberty and b) her right of access to the Courts."

Plaintiffs' third cause of action was a wrongful death claim against Harry, and that claim is not before us. Similarly, plaintiffs' fourth cause of action for negligent infliction of emotional distress against Harry is not before us.

Plaintiffs' fifth cause of action alleged negligent infliction of emotional distress against the county, the sheriff's department, and 10 unnamed persons. Plaintiffs alleged that as a result of defendants' negligence, Lisa was present and witnessed her father shoot her mother, and that she saw her

mother covered in blood and understood her mother had suffered a critical injury.

Plaintiffs' sixth cause of action was against the county alone. Plaintiffs alleged that the county's negligence caused their injury, citing Civil Code section 1714. They alleged that the county invited members of the public onto the property, charged fees for the use of the facilities, and ordered litigants to appear in court. They alleged that these circumstances created a "special relationship with the members of the public who enter the Courthouse on court-related business, including [Eileen] and [Lisa]." This special relationship gave rise to a duty of care, they claimed. Plaintiffs alleged that the county maintained the property in a negligent manner, thereby increasing the likelihood of crime by (1) failing to provide metal detectors or other adequate security measures that would prevent the introduction of weapons into the courthouse and failing to warn of the lack of security at the courthouse; (2) failing to train employees "how to handle potentially violent situations among litigants," and (3) failing to install emergency alarms.

In the seventh cause of action, also for negligence, brought against the county, the sheriff's department, and the unnamed defendants, plaintiffs alleged that unnamed persons who were employees of the county and the sheriff's department knew of Eileen's peril. Plaintiffs alleged that the employees "had contact with [Eileen Zelig] and knew of the risk of danger posed to [her] by defendant Zelig specifically, and to [her] and those similarly situated, by all litigants who were permitted to bring weapons into the Courthouse. These employees therefore had a special relationship with [her]. As a result of that special relationship, these employees owed a duty of care to [her.]" Plaintiffs alleged that the employees negligently failed to take measures to protect Eileen, "including, but not limited to failing to provid[e] metal detectors or other safety measures to prevent the introduction of weapons into the Courthouse, failing to warn her about the lack of security at the Courthouse, [and] failing to notify the appropriate authorities of the danger to her." Plaintiffs based this claim upon the potential liability of a public employee under Government Code section 820, and the liability of public entities for injuries caused by employees acting within the scope of their employment, as provided in Government Code section 815.2.

In the eighth cause of action against the county, plaintiffs alleged the county breached an implied contract to provide a reasonably safe venue for the resolution of legal claims that the public is required to pursue and defend in the courthouse.

Plaintiffs prayed for general and special damages, costs and fees, and injunctive relief to prevent the occurrence in the future of similar assaults.

Defendants demurred on the grounds that they did not owe Eileen a duty of care, that they had not maintained property in a dangerous condition, and that they were immune from liability. With respect to the claim under 42 United States Code section 1983, defendants contended that the complaint failed to allege facts demonstrating that defendants acted with deliberate indifference to plaintiffs' rights. Defendants also claimed there was no contract between Eileen and defendants.

The trial court sustained defendants' demurrer to the first amended complaint without leave to amend, and ordered dismissal. The court explained it believed that under Government Code section 845 the county and the sheriff's department were immune from liability on the state law claims. That statute affords governmental immunity for failure to provide police services. With regard to the claim under 42 United States Code section 1983, the court sustained the demurrer on the ground that plaintiffs had failed to establish any state action.

Plaintiffs appealed.

The Court of Appeal reversed the judgment of the superior court. Referring to Civil Code section 1714 as a statutory basis for imposing liability on the public entity defendants for their negligence, it concluded that the county as landowner stood in a special relationship with persons entering the courthouse to do business. The appellate court stated that as a landowner and "the party controlling the courts, [the county] owes a duty to take reasonable steps to provide safe courthouses to those who enter." The Court of Appeal offered two policy reasons in support. First, it pointed to the state's monopoly over family law matters, the fundamental rights involved for family law litigants, and the circumstance that litigants have paid fees for access to the courts. Second, it referred to a Judicial Council of California policy recognizing the need for safe courthouses. The appellate court concluded that "*if* it is foreseeable that a danger of criminal activity may cause injury to patrons of the courthouses, the [c]ounty owes a duty to take reasonable steps to implement security measures to protect against it. We reach this conclusion because of the peculiarly adversarial nature of judicial proceedings, the near monopoly the state has on the judicial forum in some cases, the enunciated policy of encouraging safe courthouses, the extent of the burden to the [c]ounty and the beneficial consequences to the community of imposing a duty to exercise care in courthouse facilities."

The Court of Appeal next addressed the issue of foreseeability. It determined that plaintiffs would be able adequately to allege foreseeability if they are able to assert that prior similar incidents have occurred in any Los

Angeles courthouse. It also concluded that plaintiffs should have an opportunity to amend the complaint to meet this requirement. The appellate court concluded the complaint adequately alleged the county's breach of duty in that "the [c]ounty maintained the courthouse in a negligent manner by failing to provide metal detectors or other safety measures, including emergency alarms, to prevent the introduction of weapons into the courthouse and then failing to provide warnings of the lack of security in the courthouse." With an amendment alleging prior similar incidents, the Court of Appeal concluded, plaintiffs may state a cause of action based on Civil Code section 1714.

The Court of Appeal also determined in light of Government Code section 835 that plaintiffs had stated a claim against the public entity defendants for injury caused by a dangerous condition of public property. It recognized that liability for maintaining property in a dangerous condition cannot be based solely upon the criminal acts of third parties. There also must be some defect in the property "such as where the public entity defendant maintained the property in such a way so as to increase the risk of criminal activity." The appellate court concluded that if, after remand, plaintiffs are able to allege prior similar incidents in any other courthouse in the county, plaintiffs adequately will allege the existence of a dangerous condition of property in the county's "failure to 'take[] measures to prevent . . . violent conduct from occurring in the Hill Street Courthouse' in light of its knowledge of volatile conduct in courthouses in the [c]ounty and the generally volatile nature of family law in particular and litigation in general. A reasonable person could easily conclude that the lack of security measures created a substantial risk of injury when the courthouse is used with due care in the manner in which it was foreseeable it would be used. [Citation.] As in [earlier cases], plaintiffs allege the dangerous condition was the lack of reasonable preventative measures which increased the likelihood of violence by allowing the introduction of weapons into the courthouse. Moreover, this defective condition, combined with the presence of a sheriff's station and signs warning that weapons are prohibited in the courthouse, both lulled Mrs. Zelig into believing it was safe to [be] in the corridor outside the courtroom and enabled Dr. Zelig to carry a gun into the courthouse knowing that the [c]ounty would not prevent him." (The parties agree that signs are posted in the courthouse stating that Penal Code section 171b prohibits persons from bringing weapons into the courthouse.)

With respect to the seventh cause of action based on an alleged duty of employees of the sheriff's department to prevent harm to Eileen, the Court of Appeal evidently concluded plaintiffs had failed to state a cause of action, at least with respect to nonpolicymaking employees. The appellate court

observed that "[t]his claim . . . cites [Government Code] section 820 involving the liability of public employees. Elsewhere, the complaint repeatedly asserts that a deputy had responded to Mrs. Zelig's earlier specific requests, suggesting that a particular duty to protect Mrs. Zelig existed on September 1, 1995. However, that Deputy Carter had in the past aided Mrs. Zelig, does not indicate that the County assumed any additional, particular task on September 1, 1995. Plaintiffs do not allege any official induced Mrs. Zelig to rely on a promise that the sheriff's department would protect her that day. [Citation.] The allegations show that Mrs. Zelig did not request aid from any sheriff on September 1, 1995. Nor have plaintiffs alleged the sheriff's department had affirmatively assumed the responsibility to protect her that day." (Italics omitted.)

The Court of Appeal further held that with amendment, plaintiffs could state a claim for negligent infliction of emotional distress but not for breach of contract.[2] It determined that plaintiffs should be afforded an opportunity to amend their complaint to state a claim under 42 United States Code section 1983 on the theory that defendants had created the danger to which Eileen was subject.

Finally, the Court of Appeal rejected the claim that defendants possess immunity under Government Code section 845, which bars liability based upon a public entity's "failure to provide sufficient police protection services." The appellate court asserted that this provision does not immunize failure to take precautionary measures when such measures do not involve " 'the kind of "budgetary and political decisions which are involved in hiring and deploying a police force." ' " The court concluded that plaintiffs stated a claim by alleging "the failure of the [c]ounty as landowner to implement 'precautionary measures' that do not involve the police or rise to the level of 'police services,' and that do not involve political and budgetary decisions about hiring and deploying police." (Italics omitted.) On the other hand, the court stated, defendants' "failure to deploy deputies to protect Mrs. Zelig" falls within the immunity of Government Code section 845.

We granted review on petition of defendants county and sheriff's department.[3] (Defendant Harry Zelig is not a party in this appeal.)

---

[2]Because plaintiffs did not petition for review on this point, we do not consider the breach of contract cause of action.

[3]The county asserts it is not a proper defendant, because it is not responsible for the state judicial system, of which the Los Angeles County Superior Court forms a part. In addition, the county asserts that even if the above claim fails, only it, and not the county sheriff's department, properly was named as a defendant. Because we determine that the trial court

## II

█ In determining whether plaintiffs properly stated a claim for relief, our standard of review is clear: " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; see also *McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189] [noting that our review is de novo].)

█ We begin our analysis of plaintiffs' claims with some observations about the obligation of public entities to protect the public against crime. Contrary to the suggestion of the Court of Appeal, the general rule is that although the government may assume responsibility for providing adequate police protection against third party violence, this does not create a legal duty that normally will give rise to civil liability. In this and in other jurisdictions, it is well established that public entities generally are not liable for failing to protect individuals against crime. (*Williams v. State of California* (1983) 34 Cal.3d 18, 23-24 & fn. 3 [192 Cal.Rptr. 233, 664 P.2d 137]; *Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 859-860 [84 Cal.Rptr.2d 157]; 5 Speiser et al., The American Law of Torts (1988) § 17:48, pp. 377-378; Prosser & Keeton, Torts (5th ed. 1984) § 131, pp. 1049-1050; Armacost, *Affirmative Duties, Systemic Harms, and the Due Process Clause* (1996) 94 Mich. L.Rev. 982, 996-997; Note, *Police Liability for Negligent Failure to Prevent Crime* (1981) 94 Harv. L.Rev. 821, 822-823; Sklansky, *The Private Police* (1999) 46 UCLA L.Rev. 1165, 1281-1283; Annot., Liability of Municipality or Other Governmental Unit for Failure to Provide Police Protection from Crime (2001) 90 A.L.R.5th 273, § 2, and cases collected.)

This general rule may be expressed as a limitation on duty or as a form of governmental immunity. Whether the rule is seen as a limitation on duty or

---

properly sustained the demurrer as to the public-entity defendants on other grounds, we need not discuss these points.

a question of immunity, the reasons for the rule are identical. As one commentator explains: "Underlying this result is a belief that the level of police protection is an allocative question best left to the political branches. To a great extent this notion also underlies the Supreme Court's refusal to recognize a due process right to safety and security . . . . The idea that adequate policing is best left to politicians rests in turn on three commonly advanced arguments. The first is that courts are poorly equipped to determine the amount of funding the public should spend on any particular service because they lack sufficient information about the budgetary trade-offs. The second is that justiciable standards for the adequacy of public services are hard to find. The third is that judicial involvement is unnecessary because elected officials will have a strong political incentive to provide adequate levels of police protection." (Sklansky, *The Private Police, supra*, 46 UCLA L.Rev. at pp. 1282-1283, fns. omitted.) The legislative and executive branches of government, then, are the branches primarily responsible for weighing the need for and effectiveness of particular security measures, the cost of such measures, the availability of funds in light of other calls on the budget as a whole, and the public's views regarding whether particular measures are acceptable or are considered too intrusive.

In the present case, the public entities' potential liability for the death of plaintiffs' mother arises under the California Tort Claims Act (hereafter referred to as the Tort Claims Act or the Act) and has two sources: (1) the public entities' liability based on their own conduct and legal obligations, and (2) the public entities' liability, based on respondeat superior principles, for the misconduct of their employees that occurred in the scope of their employment. The Tort Claims Act draws a clear distinction between the liability of a public entity based on its own conduct, and the liability arising from the conduct of a public employee. Although the Act provides that a *public employee* generally is liable for an injury caused by his or her act or omission "to the same extent as a private person" (Gov. Code, § 820, subd. (a)) and that, when the act or omission of the public employee occurs in the scope of employment the public entity will be vicariously liable for the injury (Gov. Code, § 815.2), the Act contains *no* provision similarly providing that a *public entity* generally is liable for its own conduct or omission to the same extent as a private person or entity. Rather, the Act provides that a public entity is not liable for an injury "[e]xcept as otherwise provided by statute . . . ." (Gov. Code, § 815.) Certain statutes do provide expressly for public entity liability in circumstances that are somewhat parallel to the potential liability of private individuals and entities but, as past cases have explained, " '[T]he intent of the [Tort Claims Act] is not to expand the rights of plaintiffs in suits against governmental entities, but to confine potential governmental liability to rigidly delineated circumstances . . . .' " (*Brown*

*v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 829 [15 Cal.Rptr.2d 679, 843 P.2d 624].)

We now examine these two sources of potential liability, addressing first defendants' potential liability for the death of plaintiffs' mother based on the alleged conduct of individual employees of defendants county and sheriff's department.

## A

We agree with the Court of Appeal that plaintiffs did not allege facts giving rise to a cause of action based upon the vicarious liability of the defendants for the asserted negligent acts of their employees. We have observed that in general, under the Tort Claims Act, public employees are liable for injuries caused by their acts and omissions to the same extent as private persons. (Gov. Code, § 820, subd. (a).) Vicarious liability is a primary basis for liability on the part of a public entity, and flows from the responsibility of such an entity for the acts of its employees under the principle of respondeat superior. (See *Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 932 [80 Cal.Rptr.2d 811, 968 P.2d 522].) As the Act provides, "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee," unless "the employee is immune from liability." (Gov. Code, § 815.2, subds. (a), (b).)

It is settled that "[u]nder general negligence principles . . . a person ordinarily is obligated to exercise due care in his or her own actions so as . . . not to create an unreasonable risk of injury to others . . . . [Citations.] It is well established . . . that one's general duty to exercise due care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct . . . of a third person. [Citations.]" (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 716 [110 Cal.Rptr.2d 528, 28 P.3d 249].)

At the same time, however, past cases establish that police officers and other public security officers, like other persons, generally may not be held liable in damages for failing to take affirmative steps to come to the aid of, or prevent an injury to, another person. "As a rule, one has no duty to come to the aid of another. A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to

act." (*Williams v. State of California, supra,* 34 Cal.3d at p. 23.) More specifically, "law enforcement officers, like other members of the public, generally do not have a legal duty to come to the aid of [another] person . . . ." (*Lugtu v. California Highway Patrol, supra,* 26 Cal.4th at p. 717.)

Liability may be imposed if an officer voluntarily assumes a duty to provide a particular level of protection, and then fails to do so (see *Williams v. State of California, supra,* 34 Cal.3d at pp. 23-24 & fn. 3; *Baker v. City of Los Angeles* (1986) 188 Cal.App.3d 902, 908 [233 Cal.Rptr. 760]), or if an officer undertakes affirmative acts that increase the risk of harm to the plaintiff. (See *Benavidez v. San Jose Police Dept., supra,* 71 Cal.App.4th at p. 863; *Mann v. State of California* (1977) 70 Cal.App.3d 773, 780 [139 Cal.Rptr. 82].)

■ As we have declared, "[a]s a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct." (*Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894].) A duty to control the conduct of another or to warn persons endangered by such conduct may arise, however, out of what is called a "special relationship," a concept upon which the Court of Appeal placed considerable reliance in the present case. Such a duty may arise if " '(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection.' " (*Ibid.*; see also *Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1499 [57 Cal.Rptr.2d 406].) " 'This rule derives from the common law's distinction between misfeasance and nonfeasance, and its reluctance to impose liability for the latter.' " (*Hoff v. Vacaville Unified School Dist., supra,* 19 Cal.4th at p. 933.)

■ In most instances, these general rules bar recovery when plaintiffs, having suffered injury from third parties who were engaged in criminal activities, claim that their injuries could have been prevented by timely assistance from a law enforcement officer. (See *Williams v. State of California, supra,* 34 Cal.3d at p. 25, and cases cited; *Benavidez v. San Jose Police Dept., supra,* 71 Cal.App.4th at pp. 859-862 [no liability when the police responded to domestic violence call but failed to protect victim after her subsequent call for assistance]; *Hernandez v. City of Pomona, supra,* 49 Cal.App.4th at pp. 1503-1505 [person who was aware of danger arising from his testimony at a criminal trial involving a gang was not entitled to damages for the failure of the police to warn the witness or supply special protection].) And the circumstance that an officer may have offered special protection on one occasion does not, by itself, give rise to a continuing

special relationship and duty at a later date—or with other officers. (See *Baker v. City of Los Angeles, supra,* 188 Cal.App.3d at pp. 907-908.)

■■■ As the Court of Appeal's disposition of plaintiffs' seventh cause of action demonstrates, plaintiffs did not allege facts establishing that any peace officer or other nonpolicymaking employee of the county voluntarily undertook special duties to protect Eileen or to control the conduct of Harry on September 1, 1995, or that any officer or employee did anything on that date to induce Eileen in particular to rely upon a promise of special protection. At most, employees of the defendants county and sheriff's department failed to take affirmative steps to protect Eileen. There is no indication that her peril was created by their actions. As in the *Williams* case, "[t]he officers did not create the peril in which plaintiff found herself; they took no affirmative action which contributed to, increased, or changed the risk which would have otherwise existed; there is no indication that they voluntarily assumed any responsibility to protect [her] . . . ; and there are no allegations of the requisite factors to a finding of special relationship, namely detrimental reliance by the plaintiff on the officers' conduct, [or] statements made by them which induced a false sense of security and thereby worsened her position." (*Williams v. State of California, supra,* 34 Cal.3d at pp. 27-28, fn. omitted.) Nor does the complaint allege facts demonstrating that any officer engaged in an affirmative act that increased the risk of harm to Eileen.

To the extent the complaint relies on the policy decisions of unnamed public officers and employees with regard to the nature and degree of security that should be utilized in the courthouse to protect all of its users—for example, decisions regarding the posting of signs or the installation and operation of metal detectors—such conduct would not give rise to liability on the part of these persons. This result flows from Government Code section 845, which provides immunity for the failure of public entities and their employees to provide police protection, an issue discussed below in part C.

The essence of the appellate court's holding and of plaintiffs' claims is that the *county*, rather than any individual employee standing in a special relationship with Eileen, owed a duty to *all* persons using the courthouse to protect them against reasonably foreseeable criminal activity by other persons using the courthouse—specifically, against the risk of harm presented by deadly weapons. But even in situations in which the voluntary act of a Good Samaritan officer has caused the individual officer to have a special relationship with (and duty of care toward) a particular plaintiff and in which a breach of this duty may impose liability on the employer under the

doctrine of respondeat superior, the entire law enforcement agency is not placed in a special relationship with the plaintiff or the public generally. (*Baker v. City of Los Angeles*, *supra*, 188 Cal.App.3d at p. 908.) Rather, the county, "as with all public entities," has the responsibility to "exercise reasonable care to protect all of its citizens" (*Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 753 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701], italics omitted), but does not thereby become liable to each individual for all foreseeable harm. The complaint does not allege that a public employee engaged in conduct within the scope of employment that would render the employee liable to plaintiffs for their mother's death, and thus there is no basis for imposing vicarious liability upon the public entities. Accordingly, we conclude that plaintiffs are unable to state a claim against the public entities under the doctrine of respondeat superior.

B

 Next, we consider the potential *direct* liability of the public entity defendants.

As we observed above, a public entity may be liable for an injury directly as a result of its own conduct or omission, rather than through the doctrine of respondeat superior, *but only "as . . . provided by statute."* (Gov. Code, § 815, italics added.) Plaintiffs seek to establish that a public entity properly may be held liable for injury inflicted by the criminal conduct of a third person, on the theory that the criminal conduct occurred in a public building owned and maintained by the public entity, and that such an entity, like a private property owner, may bear some legal responsibility for preventing criminal conduct on its premises.

In *Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799 [205 Cal.Rptr. 842, 685 P.2d 1193], this court, faced with a similar claim and recognizing that Government Code section 835, a part of the Tort Claims Act, "is the principal provision addressing the circumstances under which the government may be held liable for maintaining a dangerous condition of public property" (*Peterson*, 36 Cal.3d at p. 809), addressed the public entity's potential liability by analyzing and applying the provisions of section 835. The Court of Appeal in the present case, however, concluded that in addition to the specific provisions of the Tort Claims Act defining the circumstances under which a public entity may be held liable for a dangerous condition of public property, the liability of the public entities could be

based on the general negligence principles of Civil Code section 1714, which apply to and govern the potential liability of private property owners.[4]

To the extent the Court of Appeal determined that the provisions of Civil Code section 1714 properly may be applied to extend the liability of a public entity in this setting beyond the usual reach of the "dangerous condition" provisions of Government Code section 835, we conclude that the appellate court was in error. Such a determination by the court ignores the general rule that the government does not, by assuming responsibility for providing police services, impose upon itself a legal duty that would give rise to civil liability. The Court of Appeal's conclusion fails to recognize that public entities—and their employees—generally are not liable for failure to protect individuals against crime, and that the liability of public entities as property owners is set out specifically in Government Code section 835, as part of the general scheme of the Tort Claims Act. As we have noted, the Legislature has elected to impose liability on public entities principally through their potential vicarious liability for the negligence of their employees and has otherwise provided for relatively circumscribed liability. The Court of Appeal's expansive view of governmental liability potentially could undermine the balanced scheme set out in the Tort Claims Act. The rule embraced by that court could impose liability for failure to protect persons from third party crime at any public facility where passions run high—from a crowded office of the Department of Motor Vehicles to the offices of a child protective services agency.

In structuring Government Code section 835 to define the circumstances in which a public entity properly may be held liable for an injury caused by a dangerous condition of public property, the Legislature took into account the special policy considerations affecting public entities in their development and control of public property and made a variety of policy judgments as to when a public entity should or should not be liable in monetary damages for injuries that may occur on public property. These policy judgments would be undermined if an injured person could ignore the limitations embodied in Government Code section 835 and invoke the very general provisions of section 1714 of the Civil Code to impose liability on a public entity in circumstances in which such liability would not be permitted under section 835. Accordingly, we conclude that in determining the public entities' direct liability, we must evaluate plaintiffs' claim under the provisions of Government Code section 835 alone.

---

[4]Civil Code section 1714 provides that "[e]very one is responsible, not only for the result of his willful acts but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person . . . ." This statute states "the basic rule of negligence." (*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 821 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393].)

Plaintiffs claim, and the Court of Appeal determined, that plaintiffs' complaint, if amended adequately to address the issue of foreseeability, would state a cause of action under Government Code section 835, which, as we have seen, permits the imposition of liability on a public entity for injury caused by a dangerous condition of its property.

That statute provides in pertinent part that "a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 832.5 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." (Gov. Code, § 835.)

Government Code section 830 defines a dangerous condition as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."

The existence of a dangerous condition ordinarily is a question of fact, but the issue may be resolved as a matter of law if reasonable minds can come to only one conclusion. (*Peterson v. San Francisco Community College Dist., supra*, 36 Cal.3d at p. 810.)

We have recognized that private landowners have a duty to "maintain their premises in a reasonably safe condition, and that in the case of a landlord, the general duty of maintenance includes 'the duty to take reasonable steps to secure common areas against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures.' [Citation.]" (*Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1189 [91 Cal.Rptr.2d 35, 989 P.2d 121], italics omitted, disapproved on another ground in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493].) In appropriate circumstances, a public entity may owe members of the public a similar duty not to maintain public premises in a dangerous condition and, specifically, not to maintain its premises in a condition that will increase the reasonably foreseeable risk that criminal activity will injure such individuals. (See Gov. Code, § 835; *Peterson v. San Francisco Community College Dist., supra*, 36 Cal.3d at p. 812.)

In a case in which we rejected a claim that a private landowner had a duty, among other things, to provide private security guards under the circumstances there presented, we observed that it is difficult to determine the level of security adequate or effective to prevent crime. Although we did not state that the provision of private security guards *necessarily* was outside the landowner's duty of care, especially if prior similar incidents establish a high degree of foreseeability, we observed that "the obligation to provide patrols adequate to deter criminal conduct is not well defined. 'No one really knows why people commit crime, hence no one really knows what is "adequate" deterrence in any given situation.' [Citation.]" (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 679 [25 Cal.Rptr.2d 137, 863 P.2d 207].) It appears doubtful under this authority that, had the building in the present case been owned by a private landowner, the owner would be liable for failing to use particular security measures, including metal detectors, to prevent Eileen's death. In choosing to impose what it acknowledged was *broader* liability on public entities, the Court of Appeal alluded to Eileen's fundamental right to seek redress in court, the state's monopoly over the judicial process and over family law courts in particular, and the circumstance that Eileen (like all family law litigants who are not indigent) paid fees to pursue her litigation. The Court of Appeal also referred to Judicial Council recommendations regarding improvements in courthouse security (see Cal. Stds. Jud. Admin., § 7) as reflecting "a recognition of the need for safe courthouses."[5] In basing its conclusion in large part on these circumstances, however, the Court of Appeal mistook the government's undoubted mandate to establish and maintain a safe and effective system for the administration of justice for a legal duty, the breach of which may result in liability for damages.

We emphasize that public entity liability in this regard is statutory. As noted, Government Code section 835 imposes a duty on public entities not to maintain property in a "dangerous condition." Plaintiffs' decedent was killed by the criminal act of a third party, and we have pointed out that "third party conduct by itself, unrelated to the condition of the property, does not constitute a 'dangerous condition' for which a public entity may be held liable." (*Peterson v. San Francisco Community College Dist., supra*, 36 Cal.3d at p. 810.)

We have indicated, however, that a public entity may be liable if it "maintained the property in such a way so as to increase the risk of criminal

---

[5]The Court of Appeal, in a footnote, rejected plaintiffs' claim that these Judicial Council recommendations or Government Code provisions relating to the construction of courthouses could form the basis for a cause of action based on the county's breach of a mandatory duty under Government Code section 815.6. Plaintiffs did not seek our review of that holding, and we decline to address it in conjunction with our resolution of the contentions made in their answering brief on the merits.

activity" or in such a way as to "create[] a reasonably foreseeable risk of . . . criminal conduct." (*Peterson v. San Francisco Community College Dist., supra*, 36 Cal.3d at p. 812.) For example, we held in *Peterson* that the condition of a community college campus may be dangerous if the presence of trees with thick foliage near a parking lot and stairway facilitated criminal activity against students. The risk of crime was reasonably foreseeable in that case because the district was aware of prior assaults. (*Id.* at p. 813.)

In other cases, too, courts have concluded that plaintiffs could establish that a public entity maintained property in a dangerous condition within the meaning of Government Code section 835 although the injury to the plaintiff was caused by the criminal activity of third persons. Such a dangerous condition may exist, for example, when an entity with notice of criminal activity provides inadequate lighting in an airport parking lot, thereby foreseeably increasing the risk that members of the public will be attacked. (*Slapin v. Los Angeles International Airport* (1976) 65 Cal.App.3d 484, 488 [135 Cal.Rptr. 296]; see also *Zuniga v. Housing Authority* (1995) 41 Cal.App.4th 82 [48 Cal.Rptr.2d 353].)

We emphasize, however, that liability is imposed only when there is some defect in the property itself and a causal connection is established between the defect and the injury. In many cases, courts have rejected the claim that an injury caused by the criminal activity of a third person was attributable to a dangerous condition of the property within the meaning of Government Code section 835, because the claims lacked an adequate showing that the *property itself* was in a defective condition. In *Hayes v. State of California* (1974) 11 Cal.3d 469 [113 Cal.Rptr. 599, 521 P.2d 855], for example, this court in interpreting section 835 acknowledged that "[l]iability for injury caused by a dangerous condition of property has been imposed when an unreasonable risk of harm is created by a combination of defect in the property and acts of third parties." (*Hayes*, at p. 472, italics omitted.) We warned, however, that "courts have consistently refused to characterize harmful third party conduct as a dangerous condition—absent some concurrent contributing defect in the property itself." (*Ibid.*) We concluded that criminal activity at night on a public beach was not a dangerous condition requiring the public agency to issue a warning. Explaining that the complaint did not allege a defect in the property itself, we stated that even if a physical defect were not absolutely required to establish a dangerous condition, there would be no duty to warn in the circumstances then before us—in part because the risk of criminal activity on a dark and deserted stretch of beach was obvious, and in part because such a warning, if effective in discouraging visitors, would have the effect of closing the public amenity. "But," we said, "determining and regulating the use of public property are better left to

legislative and administrative bodies, rather than to the judiciary." (*Id.* at p. 473, fn. omitted.)

Similarly, in *Rodriguez v. Inglewood Unified School Dist.* (1986) 186 Cal.App.3d 707 [230 Cal.Rptr. 823], the court determined that although a school district owed a duty to protect students from injuries inflicted by nonstudents on school grounds, the district's failure to provide security measures that would prevent persons from bringing *weapons* onto school grounds did not constitute a dangerous condition within the meaning of Government Code section 835, because the district's failure did not relate to the physical condition of the property or to the misuse of the property. No simple physical barrier, the court suggested, could prevent students and others from bringing weapons onto the campus. (*Rodriguez*, at pp. 719-720.) Another decision held that the state's failure to prevent criminal activity and gang-related violence in the parking lot of the California State Fair grounds did not constitute a dangerous condition of property within the meaning of section 835. (*Turner v. State of California* (1991) 232 Cal.App.3d 883, 892 [284 Cal.Rptr. 349]; see also *Crow v. State of California* (1990) 222 Cal.App.3d 192, 204-205 [271 Cal.Rptr. 349] [failure to supervise and control a violent student at a college campus did not constitute a dangerous condition of property under § 835].) And in *Moncur v. City of Los Angeles* (1977) 68 Cal.App.3d 118 [137 Cal.Rptr. 239], involving a bomb explosion in a locker located in an area of the airport terminal open to the public, the court rejected the claim that the airport created a dangerous condition of property by locating lockers in an area of the airport where members of the public were not required to be screened by a "search and surveillance system." (*Id.* at p. 122.) The location of the locker outside the security perimeter did not "constitute[] a dangerous condition [simply] because the City did not search persons who used them." (*Id.* at p. 124.)

Other courts have pointed out that the defect in the physical condition of the property must have some *causal relationship* to the third party conduct that actually injures the plaintiff. In *Constance B. v. State of California* (1986) 178 Cal.App.3d 200 [223 Cal.Rptr. 645], for example, the court determined that although the state may have some duty to enhance the personal safety of motorists using state highway rest stops, the state's conduct in placing lights and trees so as to cast a shadow over the entrance to the women's restroom was not a substantial cause of the plaintiff's injuries at the hands of a third party assailant—the plaintiff's assailant did not take advantage of the shadows but stood in the light. (*Id.* at pp. 210-212; see also *Moncur v. City of Los Angeles*, *supra*, 68 Cal.App.3d at p. 126 [observing that the complaint did not allege facts from which it could be inferred that the physical condition of the airport terminal was the cause of the bombing].)

To summarize: "If the risk of injury from third parties is in no way increased or intensified by any condition of the public property . . . courts ordinarily decline to ascribe the resulting injury to a dangerous condition of the property. In other words, there is no liability for injuries caused *solely* by acts of third parties. [Citations.] Such liability can arise only when third party conduct is coupled with a defective condition of property." (2 Cal. Government Tort Liability Practice (Cont.Ed.Bar 4th ed., May 2001 update) Dangerous Condition of Public Property, § 12.19, p. 732.)

In the present case, the risk of injury was not increased or intensified by the condition of the property, and the necessary causal connection between the condition of the property and Harry's crime was not present. Indeed, the risk of injury to Eileen at the hands of her ex-husband was at least as great outside the courthouse. For example, he could just as readily have shot Eileen as she picked up one of her children from a public or private school. Further, in the context of applying Government Code section 835, we do not believe that screening members of the public for weapons is comparable to trimming trees or providing brighter lighting, because the screening is a police function that has little or nothing to do with the physical condition of the property. Plaintiffs assert that other protective measures (like erecting barriers or closing most of the entrances to the courthouse) should have been undertaken, but these measures would not have any effect on the risk of crimes such as those that occurred in the present case unless the county also installed metal detectors and had officers standing by to respond or used law enforcement personnel to search persons entering the courthouse. (See *Rodriguez v. Inglewood Unified School Dist.*, *supra*, 186 Cal.App.3d at pp. 719-720.) Plaintiffs' reference to the long corridors, hidden escalators, and maze-like design of the building are equally unavailing. Plaintiffs did not allege facts indicating that such conditions had any causal relationship with the shooting. We conclude that the allegations of the complaint, even if proved, fail to demonstrate that the injury was "caused by a dangerous condition of [the] property," as required by Government Code section 835.

In reaching a contrary conclusion, the Court of Appeal relied upon *Zuniga v. Housing Authority*, *supra*, 41 Cal.App.4th 82. In that case, tenants in a public housing facility were killed in an arson fire set by drug dealers who congregated outside the victims' unit and targeted the tenants for reprisals after the tenants complained to the housing authority of the drug dealers' activities. The housing authority clearly was on notice of the danger posed by the perpetrators. The victims "were subjected to constant threats of violence, vandalism to their unit and physical assaults and confrontations by the various drug dealers. Family members were constantly warned by the offenders not to call the police, but nevertheless, they reported [the incidents

to them] . . . . No action was taken to alleviate the situation, and their repeated requests for a transfer to another unit were denied." (*Id.* at p. 90.) The tenants' complaints against the drug dealers were met with increasing harassment, and ultimately "arsonists poured gasoline through the unit's mail slot and set fire to the unit." (*Ibid.*) Five persons died.

The Court of Appeal determined that the plaintiffs adequately pleaded a dangerous condition by alleging that "inadequate security measures [were] taken by respondents in face of the existence of a centralized location where drug dealers with violent tendencies congregated. . . . [T]he [public entities] failed to warn the residents, failed to transfer residents, failed to expel criminal tenants, failed to place security barriers, and failed to otherwise take appropriate security measures. . . . According to the complaint, appellants were at risk simply by virtue of their being assigned to the unit and became targets of increased hostility merely because they reported their difficulties to the Authority." (*Zuniga v. Housing Authority, supra,* 41 Cal.App.4th at pp. 93-94.) The Court of Appeal distinguished earlier Court of Appeal cases, asserting that in those cases the criminal activity was not foreseeable and could not have been prevented without "drastic precautions." (*Id.* at p. 94.)

The Court of Appeal also stressed that the housing authority stood in a "special relationship" with its tenants in that it voluntarily assumed a duty of care toward them, and the tenants depended upon the housing authority for a transfer to another unit and "to take responsibility for the hazards that existed within the project." (*Zuniga v. Housing Authority, supra,* 41 Cal.App.4th at p. 95.)

Liability under Government Code section 835 for maintaining public property in a dangerous condition depends, however, upon the existence of *some* defect in the property itself and the existence of a causal connection between that defect and the plaintiff's injury. The opinion of the Court of Appeal in *Zuniga* does not describe the physical condition of the property or the purported causal connection between that defect and the harm suffered by the plaintiffs. It is unclear, at best, how "security barriers" could have prevented the perpetrators from burning the unit in front of which they congregated, especially because it appears that the perpetrators also were tenants of the housing authority. (*Zuniga v. Housing Authority, supra,* 41 Cal.App.4th at p. 93.) The failure of the court in *Zuniga* to relate the physical condition of the property to the conduct of the arsonists renders questionable its conclusion that liability may be found under Government Code section 835—although we have no occasion in the present case to consider whether there may be some other statutory basis for finding that the landlord-tenant relationship could support the imposition of a legal duty on the housing

authority in such circumstances. But failure to transfer tenants for their protection and failure to evict tenants involved in criminal activities are matters far removed from any physical condition of the property.

In any event, in the present case plaintiffs are unable to point to any defective aspect of the purely physical condition of the property.

Plaintiffs contend that it is not necessary that they allege a physical defect in the property, citing *Ducey v. Argo Sales Co.* (1979) 25 Cal.3d 707 [159 Cal.Rptr. 835, 602 P.2d 755]. Failure to install protective equipment, they claim, can itself constitute a dangerous condition of property. In the *Ducey* case, the plaintiffs contended that the state maintained a roadway in a dangerous condition because the state failed to provide a median barrier to protect motorists against oncoming drivers who crossed the median strip. Although this court acknowledged that the state generally has a duty to maintain its property in a physical condition that protects users against the risk of harm presented by third parties, the state's duty in the *Ducey* case was to alter the *physical condition of the property* to provide a safeguard against the danger presented by third parties. The court did not hold that a dangerous condition of property could exist without reference to any physical quality of the property, but only that the state may be required to alter its property to provide a physical barrier against danger presented by third parties.

Plaintiffs claim that, just as a barrier should have been installed in the *Ducey* case, so should a physical barrier have been installed in the present case. The defect in the maintenance of the property, they assert, was the county's "failure to lock or barricade most of the Courthouse entryways, and its failure to place inexpensive, portable metal detectors, 'wands,' in the hands of uniformed personnel already assigned to monitor the Courthouse's main entrances . . . ." These omissions, plaintiffs urge, increased the risk of harm faced by Eileen and other users of the courthouse.

In the present case, in contrast to the *Ducey* case, it does not appear that the addition of a physical barrier, by itself, would have had any effect on the risk of harm faced by Eileen or other persons using the courthouse. A physical barrier against the ingress of persons would not have served to reduce this risk, because litigants—even angry litigants—need access to the courts and normally are entitled to be present in the courthouse. Reducing the number of points of entry would not by itself have prevented persons in possession of firearms from passing through the main entrance. Finally, a barrier against the introduction of weapons cannot be comprised of a simple physical barrier, at least given current technology, but requires personnel to conduct screening, deny entrance to persons carrying weapons, and confiscate those weapons. This amounts essentially to providing police service. As

we explain in the next part of our opinion, the public entities and their policymaking officers and employees are immune from liability for any failure on their part to provide sufficient police services.

Plaintiffs urge that the risk of harm from armed litigants was so foreseeable and so peculiar to the courthouse property that this property should be considered as exhibiting a dangerous condition under Government Code section 835. The risk of harm may have been obvious in that particular location, but plaintiffs are unable to point to the manner in which the physical condition of the property should have been altered to prevent the shooting of Eileen. They characterize certain physical characteristics of the property as unique, "including its multi-level, labyrinthine structure, its seemingly endless hallways and corridors, its partially hidden escalators, and its seventeen points of entry which allowed virtually unrestricted and un-monitored access," claiming that these characteristics "contributed directly and substantially to the likelihood that weapons would be brought into the Courthouse without detection and used there." As noted, however, we do not observe any factual allegations in the complaint that the hallways, escalators, size, or layout of the building were *causally related* to the shooting. If the complaint had contained such allegations, the defendants, no doubt, would have raised the defense of design immunity. (See Gov. Code, § 830.6; *Cornette v. Department of Transportation* (2001) 26 Cal.4th 63 [109 Cal.Rptr.2d 1, 26 P.3d 332].)

Plaintiffs contend finally that the county maintained the courthouse in a manner that increased the risk of criminal activity because, as the parties agree, the county posted signs in the courthouse warning that it is a felony to bring weapons into the courthouse (Pen. Code, § 171b), but failed to post signs warning "of the lack of security at the courthouse." Such a warning sign, however, might be counterproductive—not only could it actually *invite* armed attacks in the courthouse, it also could discourage litigants from resorting to their courts. To discourage the public from using public facilities is undesirable, as we found in *Hayes v. State of California, supra*, 11 Cal.3d 469, 473, even in the context of a public beach. (See also *Turner v. State of California, supra*, 232 Cal.App.3d at p. 895.)

The element of causation also is missing. It is apparent from the allegations in the complaint that a warning sign would have been superfluous—Eileen was aware of the danger presented by her ex-husband and also must have been aware from her own experience that persons entering the courthouse were not screened for weapons. The suggestion that with adequate warning she would have secured an adult escort overlooks the circumstance that she must have been aware of her risk without having received any formal warning by the county.

Cases examining whether a public employee may create a duty to a member of the public by inducing reliance or increasing the other person's risk of harm are of no assistance to plaintiffs in their effort to establish the *direct* liability of the public entity defendants. These cases examine the conduct of individual employees with respect to individual plaintiffs or third parties. They vicariously impose liability on the public entity for breach of duty. As concluded by the Court of Appeal, plaintiffs have not alleged successfully that the conduct of any individual county employee induced Eileen's reliance or put her at increased risk of harm on the day of the crime.

Accordingly, we conclude that Government Code section 835 does not provide a statutory basis for liability in the present case.[6]

## C

We have alluded above to the statutory immunity of both a public entity and a public employee "for failure to provide sufficient police protection service." (Gov. Code, § 845.) This provision supports our conclusion that the relevant parts of the Tort Claims Act do not impose liability upon either the public entity defendants or their policymaking officers and employees under the facts alleged in the present complaint.[7]

Even before the enactment of the Tort Claims Act, public entities enjoyed sovereign immunity in most instances from liability for their failure to provide police services. (See *Gates v. Superior Court* (1995) 32 Cal.App.4th 481, 500 [38 Cal.Rptr.2d 489], and cases cited.) As noted, "[t]he 'overwhelming' weight of case law 'reject[s] liability based on a general failure to provide police protection.' " (Sklansky, *The Private Police*, *supra*, 46 UCLA L.Rev. at pp. 1281-1282.)

In recommending adoption of the language of Government Code section 845 as part of the Tort Claims Act, the California Law Revision Commission

[6]Because we reach this conclusion, we need not consider the issue whether the county had actual or constructive notice with respect to the claimed dangerous condition. Accordingly, defendant's request that we take judicial notice of materials demonstrating the volume of business in the Los Angeles County Superior Court, as well as nationwide trends in the incidence of violent crime, is denied. In light of our conclusion regarding Government Code section 835, we need not reach the issue whether the attack on Eileen was foreseeable. Thus, plaintiffs' request that we take judicial notice of the existence of a number of newspaper and periodical articles relating to courthouse security also is denied. The truth of the content of the articles is not a proper matter for judicial notice, and the circumstance that the articles were published is irrelevant to our discussion. (See *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1064 [31 Cal.Rptr.2d 358, 875 P.2d 73].)

[7]Government Code section 845 provides: "Neither a public entity nor a public employee is liable for failure to establish a police department or otherwise to provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service."

stated: "This section grants a general immunity for failure to provide police protection or for failure to provide enough police protection. Whether police protection should be provided at all, and the extent to which it should be provided, are political decisions which are committed to the policy-making officials of government. To permit review of these decisions by judges and juries would remove the ultimate decision-making authority from those politically responsible for making the decisions." (Cal. Law Revision Com. com., 32 West's Ann. Gov. Code (1995 ed.) foll. § 845, p. 452.)

■ The Legislature adopted the language suggested by the Law Revision Commission, together with provisions specifying other similar immunities. (See Gov. Code, §§ 845.2 [failure to provide a prison], 846 [failure to make an arrest], 850 [failure to provide fire protection services].) As one Court of Appeal explained, Government Code section 845 "was designed to prevent political decisions of policy-making officials of government from being second-guessed by judges and juries in personal injury litigation. [Citation.] In other words, essentially budgetary decisions of these officials were not to be subject to judicial review in tort litigation." (*Mann v. State of California, supra,* 70 Cal.App.3d at pp. 778-779.)

Government Code section 845 has provided immunity in a number of circumstances, some involving public premises and some private. Contrary to plaintiffs' claim, courts have not drawn a distinction in this respect between public entities in their capacity as landowners and public entities in their capacity as providers of public services. In *Peterson v. San Francisco Community College Dist., supra,* 36 Cal.3d 799, for example, a college student was attacked on a dark stairway in a parking lot located on a campus operated by a public entity. As noted in our discussion of liability under Government Code section 835, the college district could be liable for maintaining a dangerous condition on its property in that it failed to trim foliage in the parking lot and around the stairway. Despite its awareness of earlier attacks, however, and the circumstance that it had authority to (and did) maintain a police force, the district was immune from liability for its asserted failure " 'to employ *adequate* police personnel,' " that is, personnel " 'to patrol the parking lot and stairway in question' " on its campus. (*Peterson v. San Francisco Community College Dist., supra,* 36 Cal.3d at p. 814, italics added.) As we explained, the immunity extended by Government Code section 845 "is meant to protect the budgetary and political decisions which are involved in hiring and deploying a police force." (*Peterson,* at p. 815.)

Other examples in which immunity pursuant to Government Code section 845 has shielded public entities include: an asserted failure to provide

adequate security patrols in the parking lot of the state fairgrounds despite the foreseeability of gang violence there (*Turner v. State of California, supra,* 232 Cal.App.3d at pp. 894-895), failure to provide police patrols or sufficient police patrols of the parking lot of a public airport despite reports of earlier assaults (*Slapin v. Los Angeles International Airport, supra,* 65 Cal.App.3d at p. 487), failure to prevent the placement of a bomb in an airport locker by providing searches in or surveillance of the airport common area (*Moncur v. City of Los Angeles, supra,* 68 Cal.App.3d at p. 122), and delay in responding to a call for assistance against an assailant or robber (*Hartzler v. City of San Jose* (1975) 46 Cal.App.3d 6, 9 [120 Cal.Rptr. 5]; *Antique Arts Corp. v. City of Torrance* (1974) 39 Cal.App.3d 588, 592-593 [114 Cal.Rptr. 332]).

In *Hartzler v. City of San Jose, supra,* 46 Cal.App.3d 6, for example, a woman telephoned the San Jose Police Department to report that her estranged husband had announced that he was coming to her home to kill her. She requested assistance but it was refused, and she was told to call again when the estranged husband arrived. He arrived and killed the woman before she could call again. The department was aware of the man's many prior threats and assaults. The Court of Appeal found that the department's failure to provide assistance or protection fell within the immunity provided by Government Code section 845. The appellate court rejected a claim that the police owed a duty arising out of a special relationship based upon the decedent's asserted detrimental reliance upon police protection. (*Hartzler v. City of San Jose, supra,* 46 Cal.App.3d at p. 9.)

More recently, a county was held to be immune from liability for its failure to deploy its numerous *available* on-duty police officers to provide protection to persons injured during a riot. (*Gates v. Superior Court, supra,* 32 Cal.App.4th 481.) In that case, the defendants were senior supervisors in the Los Angeles Police Department. It was alleged that they had actual knowledge that a riot was about to occur in the South Central area of Los Angeles, but directed that police resources be devoted to other areas with predominantly White inhabitants; that they were aware that violence had erupted at a certain intersection, but withdrew police officers from the area and directed officers not to respond to calls for assistance; and that although available officers were assembled at a field command post and were requested to provide protective services at the intersection, defendants ordered that the officers not be deployed. The plaintiffs, alleging that in the absence of police protection they were injured at the hands of the unrestrained mob at the intersection, sought compensation for violation of their civil rights under state and federal provisions.

The Court of Appeal in *Gates,* concluding that in light of Government Code section 845 the trial court should have sustained the defendants'

demurrer, explained that the plaintiffs' claims were "premised upon a failure to provide adequate police protection at the intersection where they were attacked. Defendants are immune from civil liability for money damages for failing to provide adequate police protection against participants in criminal conduct during a riot." (*Gates v. Superior Court, supra,* 32 Cal.App.4th at p. 494.) The court pointed out that the intent of the Tort Claims Act was to confine rather than expand governmental liability (*Gates,* at p. 495, citing *Brown v. Poway Unified School Dist., supra,* 4 Cal.4th at p. 829), and that historically the common law provided sovereign immunity for governmental activities, including alleged failure to provide sufficient police protective services. Citing the California Law Revision Commission comments quoted above, the court concluded that it was clear the Legislature intended to continue this immunity in the Tort Claims Act. (*Gates v. Superior Court, supra,* 32 Cal.App.4th at p. 501.)

The *Gates* opinion also relied upon an earlier case, *Susman v. City of Los Angeles* (1969) 269 Cal.App.2d 803 [75 Cal.Rptr. 240], which concluded that Government Code section 845 provided immunity for claims arising out of a riot, including claims that the police had not employed the correct means to quell the riot. Immunity extended to claims that the public entity and its employees failed to disperse a crowd, to use intelligence officers, to use tear gas properly to disperse crowds, and to secure assistance from the National Guard or other entities in a timely manner, and that subordinate police officers failed to follow orders. (*Susman v. City of Los Angeles, supra,* 269 Cal.App.2d at pp. 811-820.) As the court concluded in *Gates*: "[F]ailure to place police protective services in an area which is the subject of a riot is precisely the kind of decision which is the basis for the section 845 immunity . . . ." (*Gates v. Superior Court, supra,* 32 Cal.App.4th at pp. 502-503.) In sum, " 'the extent to which police protection should be provided—in this case, with respect to the area where plaintiffs' property was located—is a political decision which is committed to the policy-making officials of government . . . .' " (*Id.* at p. 503.)

Thus, contrary to plaintiffs' claim, the decision whether and how to equip and deploy available police personnel falls within the immunity provided by Government Code section 845. Plaintiffs claim that the county should have prevented Harry from bringing his weapon into the courthouse, but this could be accomplished only by a policy allocating police or security personnel to confiscate weapons or deny entrance to those carrying weapons—either by searching each person entering the courthouse or by operating fixed or portable metal detectors. We believe that plaintiffs' claim goes to the essence of the county's discretion in determining how much police protection to provide and how to allocate its resources.

Plaintiffs assert that they simply are claiming that the county is not immunized for its failure to provide protective measures *other* than added police protection. We are not persuaded, however, because plaintiffs' allegations, assuming their truth, do not support the conclusion that the lack of other protective measures caused Eileen's death. Even under plaintiffs' theory of liability, Eileen could have been protected only by deployment of security forces to prevent Harry from bringing his weapon into the courthouse or discharging it in the courthouse. Although plaintiffs refer to certain characteristics of the building, it is evident from our discussion of the claimed dangerous condition of the courthouse that they are unable to explain how failure to correct the labyrinthine design of the courthouse or to close its many entrances had any causal connection with the shooting.

Plaintiffs' reliance upon our decision in *Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780 [221 Cal.Rptr. 840, 710 P.2d 907], is unavailing. In that case, we identified statutory and common law special relationships between the operator of a common carrier and its passengers that established a duty of care on the part of the bus driver to take *some* action to protect passengers from assaults by fellow passengers, but we did not question that the public transit district would be immune had it been alleged that the district "fail[ed] to provide police personnel or armed guards on board its buses." (*Id.* at p. 792.)

Plaintiffs also rely upon *Zuniga v. Housing Authority, supra,* 41 Cal.App.4th 82, in which, as we have seen, the Court of Appeal determined that a complaint arising out of injuries caused on public housing premises by arsonists and drug dealers adequately alleged injury other than failure to provide adequate police protection. The court explained that "to the extent that appellants allege damages from the City's and the Authority's failure to (1) provide sufficient numbers of police personnel to patrol that particular housing protect; (2) combat vandalism and terrorism by drug dealers [citation]; (3) provide police protection at certain hours or in certain areas [citations]; (4) respond to a call in sufficient time [citations]; (5) train officers adequately; or (6) rid the housing project of drug dealers [citation], section 845 immunity may be available.

"Section 845 immunity however, may not extend to the claims that the Authority failed to transfer appellants, failed to warn them about the problems in the particular unit [citation], failed to arrest or reprimand the perpetrators once they were apprised of the nature of the offenses [citations], or failed to erect barriers to keep out intruders, and failed to evict those tenants who sold drugs and harassed other tenants." (*Zuniga v. Housing Authority, supra,* 41 Cal.App.4th at pp. 99-100, fns. omitted.)

The court in *Zuniga* erred in supposing that immunity was not provided from a claim of failure to make an arrest, at least where it was not demonstrated that the police had placed the particular victim in peril or had induced reliance. (See Gov. Code, § 846 ["Neither a public entity nor a public employee is liable for injury caused by the failure to make an arrest or by the failure to retain an arrested person in custody"].) With respect to the other elements of the tenants' claim in *Zuniga*, nothing in the present case is comparable to the claim that the housing authority failed to employ administrative measures to transfer or evict tenants. As for the asserted failure to erect barriers in *Zuniga*, the appellate court's opinion fails to consider the issue of causation—it does not explain what sort of physical barriers could have kept the arsonists from attacking the plaintiffs. In any event, we are not aware of any purely physical barrier that could prevent persons with business at a county courthouse from bringing concealed firearms into the building. As noted, the use of any metal detector, whether fixed or hand held, would require an administrative decision to deploy officers in a particular manner and at a particular place. Such a decision comes within the immunity provided by Government Code section 845.

Cases from other jurisdictions are in accord in concluding that public entities are immune from liability for failure to provide sufficient security against criminal assaults committed upon persons conducting business in a court facility. (See *Jenks v. Sullivan* (Colo. 1992) 826 P.2d 825, 827-828, overruled on other grounds in *Bertrand v. Board of County Com'rs* (Colo. 1994) 872 P.2d 223; *Duong v. Co. of Arapahoe* (Colo.Ct.App. 1992) 837 P.2d 226, 230-231; *Landry v. City of Detroit* (1985) 143 Mich.App. 16 [371 N.W.2d 466, 468-469] [public entity immune from negligence claim, though nuisance claim may go forward], overruled with respect to the holding regarding the nuisance claim in *Hadfield v. Oakland County Drain Com'r* (1988) 430 Mich. 139 [422 N.W.2d 205, 222, 230-232]; see also *Lawson v. City of Chicago* (1996) 278 Ill.App.3d 628, [215 Ill.Dec. 237, 662 N.E.2d 1377, 1382-1383] [a city is immune from liabilty for failure to protect a high school student from a firearm assault by screening entry to the school with a properly operating metal detector].) Plaintiffs have not cited any authority indicating a different outcome for a similar claim in any other jurisdiction. More generally, as we have seen, overwhelming authority " 'reject[s] liability based on a general failure to provide police protection.' " (Sklansky, *The Private Police, supra*, 46 UCLA L.Rev. at pp. 1281-1282; see also Prosser & Keeton, Torts, *supra*, § 131, p. 1049; Note, *Police Liability for Negligent Failure to Prevent Crime, supra*, 94 Harv. L.Rev. at pp. 822-823; Armacost, *Affirmative Duties, Systemic Harms, and the Due Process Clause, supra*, 94 Mich. L.Rev. at p. 985 ["In the tort context—contrary to a strong, general trend toward increased governmental liability—the overwhelming presumption *against* liability for failure to protect has held fast"]; *id.* at p. 996 ["an

overwhelming majority of jurisdictions start with a presumption that the government generally is not liable for failing to protect people from injuries by nongovernmental sources, even when governmental officials have been informed or are aware of the risk of harm"].)

D

██ Finally, plaintiffs alleged that defendants are liable under 42 United States Code section 1983 (section 1983) for depriving Eileen of her constitutional right to due process of law. They claim that the county's asserted deliberate indifference to the safety and welfare of persons using the courthouse constitutes a due process violation. The Court of Appeal determined that plaintiffs should be afforded the opportunity to amend the complaint to supply additional allegations in support of their claim that defendants affirmatively placed Eileen in danger.

██ Local governmental entities " 'can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted . . . .' " (*Pitts v. County of Kern* (1990) 17 Cal.4th 340, 348-349 [70 Cal.Rptr.2d 823, 949 P.2d 920], quoting *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658, 690 [98 S.Ct. 2018, 2035-2036, 56 L.Ed.2d 611].) Local governmental entities also can be sued " " 'for constitutional deprivations visited pursuant to governmental "custom." ' " (*Pitts v. County of Kern, supra,* 17 Cal.4th at p. 349, quoting *Monell v. New York City Dept. of Social Services, supra,* 436 U.S. at pp. 690-691 [98 S.Ct. at p. 2036].) In addition, " '[t]he plaintiff must . . . demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.' " (*Pitts v. County of Kern, supra,* 17 Cal.4th at p. 349, quoting *Board of Comm'rs of Bryan Cty. v. Brown* (1997) 520 U.S. 397, 404 [117 S.Ct. 1382, 1388, 137 L.Ed.2d 626].)

██ Plaintiffs claim that the county failed to protect Eileen from Harry and to ensure her safe access to the courts, and that this failure constituted a violation of her right to substantive due process of law, giving rise to a claim under section 1983. It is settled, however, that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to

deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." (*DeShaney v. Winnebago Cty. Soc. Servs. Dept.* (1989) 489 U.S. 189, 195 [109 S.Ct. 998, 1003, 103 L.Ed.2d 249].) As the United States Supreme Court has concluded, generally "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." (*Id.* at p. 197 [109 S.Ct. at p. 1004].)

 The high court has recognized "that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." (*DeShaney v. Winnebago Cty. Soc. Servs. Dept., supra,* 489 U.S. at p. 198 [109 S.Ct. at p. 1004].) When the state has taken a person into custody and has deprived the individual of the ability to care for himself or herself, the state must provide for basic needs such as "food, clothing, shelter, medical care, and reasonable safety. . . ." (*Id.* at p. 200 [109 S.Ct. at pp. 1005-1006].) As the United States Supreme Court has explained, "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . ." (*Ibid.*; see also *Huffman v. County of Los Angeles* (9th Cir. 1998) 147 F.3d 1054, 1058-1059.)

 Plaintiffs cannot make out a claim under this exception, because Eileen was not in custody. They claim that she was entitled to protection, like an incarcerated person, because defendants deprived her of her ability to provide for her own safety while in the courthouse, prohibiting her from carrying a weapon. Plaintiffs offer no relevant authority for the proposition that all litigants who must be present in the courthouse to pursue their litigation should be considered to be in de facto custody or to be the beneficiaries of a special relationship entitling them to enhanced protection against third party crime, and our research discloses only authority to the contrary. (*Duong v. County of Arapahoe, supra,* 837 P.2d at pp. 229-230.) Exceptions to the high court's general rule of nonliability have been extremely limited. (See 1 Nahmod, Civil Rights and Civil Liberties Litigation (4th ed. 2000) § 3.60, pp. 3-159 to 3-181 [collecting cases and explaining that exceptions to the *DeShaney* rule of nonliability are limited]; see also *County of Sacramento v. Lewis* (1998) 523 U.S. 833, 842-845 [118 S.Ct. 1708, 1714-1716, 140 L.Ed.2d 1043] [discussing the high court's narrow view of the concept of substantive due process and its reluctance to expand that concept].)

The circumstance that Eileen was required to be at the courthouse and was prohibited by state law from bringing a weapon into the courthouse does not

distinguish this matter from cases such as *DeShaney*, where the United States Supreme Court found no liability resulting from the action of a local entity in granting custody of a child to his father and failing to remove the child from the father's custody despite knowledge that the father was abusing the child. Although the child was in his father's custody pursuant to a court order and was helpless to protect himself, these circumstances were held not to impose an affirmative duty upon the state to protect him.

A related exception to the rule of nonliability, and the one relied upon by the Court of Appeal, applies when the governmental entity has taken some affirmative action that places the person in danger. (See *Huffman v. County of Los Angeles, supra*, 147 F.3d at p. 1059.) The " 'danger creation' basis for a claim . . . necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger." (*L.W. v. Grubbs* (9th Cir. 1992) 974 F.2d 119, 121.) Plaintiffs must "plead facts showing some *affirmative act* on the part of the state that either created a danger to the plaintiff or rendered him more vulnerable to an existing danger. In order for the state created danger theory to be available, the 'state [must] *affirmatively* place[] a particular individual in a position of danger the individual would not otherwise have faced. . . .' " (*Stevens v. Umsted* (7th Cir. 1997) 131 F.3d 697, 705].) Further, " '[i]naction by the state in the face of a known danger is not enough to trigger the obligation [to protect private citizens from each other].' " (*Ibid.*, bracketed language in *Stevens*; see also *Estate of Amos ex rel. Amos v. City of Page, Ariz.* (9th Cir. 2001) 257 F.3d 1086, 1091-1092.)

For example, in a case in which police officers, arriving at the scene of a serious automobile accident and aware that a motorist involved in the accident had set out to walk alone across a desert at night in freezing weather, conducted only a cursory search for him, the United States Court of Appeals for the Ninth Circuit held that the trial court properly sustained a demurrer to a claim under section 1983, because the officers did not create the danger facing the motorist or do anything affirmative to make him more vulnerable. The circumstance that the officers also called off civilian rescue efforts did not alter the court's conclusion, because there was no reason to believe that civilian rescue efforts would have been successful had the officers not interfered. "[Decedent] was in great danger before the officers appeared. Although in theory a very poor rescue attempt could make those needing rescue worse off than if the attempt had not been made, the probability that the conduct of the police officers in this case actually made [him] worse off is extremely speculative. 'If the defendants deprived [him] of anything it was of some right to competent rescue services. But . . . there is no such right in the Fourteenth Amendment.' [Citation]." (*Estate of Amos ex rel. Amos v. City of Page, Ariz., supra*, 257 F.3d at p. 1091.) Furthermore,

"[w]hile the police officers' search may have been incompetent, lacking in scope and duration, any danger that presented itself to [decedent] as a result of the state's action or inaction did not implicate due process." (*Id.* at p. 1092; see also *Johnson v. Dallas Independent School Dist.* (5th Cir. 1994) 38 F.3d 198, 201 [public entity defendants, in order to be liable under the creation of danger theory, "must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur"].)

 We believe that plaintiffs' claim simply constitutes a complaint that the county failed to protect Eileen against a danger presented by a third party. The public entities and their employees did not create the danger she faced, nor did they make it appreciably greater. The danger faced by Eileen that her husband would shoot her was the same inside the courthouse as outside. The circumstance that the state, by enacting a general statute prohibiting the possession of a firearm in any courthouse, curtailed her ability to arm herself in self-defense, certainly provides no greater justification for finding a substantive due process violation than does the calling off of the private search efforts involved in the *Amos* case or the public entity's failure to intervene to protect the child from his father in the *DeShaney* case.

Accordingly, we conclude that plaintiffs cannot state a claim under section 1983.[8]

## III

For the foregoing reasons, we reverse the judgment of the Court of Appeal and remand the matter to that court with directions to affirm the judgment rendered by the trial court in favor of defendants.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

---

[8]The Court of Appeal declined to uphold plaintiffs' claim that the conduct of the defendants was separately actionable as a violation of Eileen's right to free access to the courts. Because plaintiffs did not seek review on this point, we do not consider it.