Filed 10/15/13  Hollingsworth v. Lincoln General Ins. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| GERALD V. HOLLINGSWORTH, Jr. et al.,<br><br>      Plaintiffs and Appellants,<br><br>      v.<br><br>LINCOLN GENERAL INSURANCE COMPANY et al.,<br><br>      Defendants and Respondents. | B240536<br><br>(Los Angeles County<br>Super. Ct. No. BC442363) |

APPEAL from judgments of the Superior Court of Los Angeles County, Michael Johnson, Judge.  Affirmed.

Law Offices of Gary Hollingsworth, Gary Hollingsworth for Plaintiffs and Appellants.

Charlston, Revich & Wollitz, Robert D. Hoffman, for Defendant and Respondent Lincoln General Insurance Company.

Murchison & Cumming, Jean M. Lawler, Nancy N. Potter, for Defendant and Respondent Powers & Effler Insurance Brokers, Inc.

## INTRODUCTION

Plaintiffs and appellants Gary and Ivy Hollingsworth contracted with general contractor Baker Brothers Construction, Inc. (BBCI) to remodel their house. Dissatisfied with BBCI's performance, plaintiffs "rescinded and terminated" the contract. BBCI brought an action against plaintiffs for breach of contract, quantum meruit, and unjust enrichment, and plaintiffs filed a cross-complaint against BBCI for negligence and breach of contract (BBCI Action). BBCI tendered the defense of the cross-complaint to its insurer, defendant and respondent Lincoln General Insurance Company (Lincoln), which denied a defense and indemnity to BBCI. Thereafter, BBCI and plaintiffs settled the BBCI Action, which settlement included BBCI's assignment to plaintiffs of any claims or causes of action BBCI had against Lincoln or BBCI's insurance broker, defendant and respondent Powers & Effler Insurance Brokers, Inc. (Powers), in connection with the disputed insurance coverage for the BBCI Action. Plaintiffs then brought an action against Lincoln for failing to defend and indemnify BBCI in the BBCI Action and against Powers for failing to procure for BBCI insurance that would have covered the allegations in plaintiffs' cross-complaint in the BBCI Action (Coverage Action).

In their first amended complaint in the Coverage Action, plaintiffs asserted causes of action for breach of contract, breach of the covenant of good faith and fair dealing, and fraud against Lincoln, and breach of contract and negligence against Powers. The trial court granted Lincoln's motion to strike plaintiffs' punitive damages claim in connection with the breach of the covenant of good faith and fair dealing cause of action. It sustained, without leave to amend, Lincoln's demurrer to the fraud cause of action and found moot Lincoln's motion to strike an accompanying claim for punitive damages. Thereafter, Lincoln and Powers successfully moved for summary judgment. Plaintiffs appeal from the order sustaining Lincoln's demurrer, a purported order striking the punitive damages claim, the orders granting summary judgment, and an order denying certain motions to compel discovery responses. We affirm.

## I. Lincoln's Summary Judgment Motion

### A. Factual Background

Plaintiffs owned a home on Cumberland Road in the City of San Marino (City). In 2007, they contracted with Sash & Door Specialty, Inc. dba JCC Door Specialty (JCC) to remodel their home (JCC Project). The plans and specifications for the JCC Project (Original Plans) called for the addition of a second floor. Certain parts of the home were not involved in the project, including two rear bedrooms, an adjoining bathroom in the east wing, and a study in the west wing. The City approved the plans on November 28, 2006.

The JCC Project involved "limited demolition work" of "a small portion of the structure where the living room and second-story addition were to be constructed." On December 10, 2007, plaintiffs terminated JCC for failing adequately to prosecute work on the JCC Project. Plaintiffs believed that JCC had conducted "excessive and improperly sequenced demolition" of their house and that JCC caused damage to their house that "was so extensive that the remainder of the structure, with the exception of the 4 car garage and circular driveway, was beyond repair."

In January 2008, plaintiffs entered into negotiations with BBCI to "repair, rebuild, and complete construction of the Property." Plaintiffs provided BBCI with copies of the Original Plans and a second set of plans (Revised Plans), not approved by the City, that added an additional 614 square feet to the house (together Plans).

According to plaintiffs, BBCI conducted extensive inspections of their home, reviewed the Plans, and recommended to plaintiffs that the remainder of their damaged home be demolished. Curtis Baker[2] of BBCI told plaintiffs that it would be less costly to demolish the entire structure—excluding the foundation and the four-car garage—rather

---

[1] The facts stated are undisputed or not, in effect, contradicted.

[2] Because we later refer to Julie Baker, Curtis Baker's wife and BBCI's corporate secretary, we refer to the Bakers by their first names.

than trying to salvage any part of the home. Plaintiffs pointed out to Curtis that neither the Original Plans nor the Revised Plans called for complete demolition and expressed concern about whether the City would require an additional permit for the complete demolition that he recommended. Curtis told plaintiffs that he had an excellent relationship with the City and knew its rules. In his experience, a permit was not required for demolition. Curtis reassured plaintiffs that "even the extra demolition work was required, the work would still be within the perimeters of the approved plans, which were the plans he would follow in this whole project." In January and February 2008, BBCI sent proposed contracts to plaintiffs to perform the work at their home.

On March 13, 2008, plaintiffs sent a fax to Curtis. The fax stated in part, "Hi Curt, the attached is some more corrections that need to be incorporated into the final version. The actual site inspection which shows discrepancy with both sets of plans provided to you, mainly, the over demolition and the needs to tear down both remaining side wings, etc., need to be emphasized to account for the basis of the total contract price. This is most important but was left out in yesterday's memo. We appreciate your kind consideration and apologize for any inconvenience caused. [¶]—[¶] 2) Pg 1, 'The Owner has requested the Contractor to begin work on the project'—here please add: 'by first cleaning up the job site, picking up the remaining work left by the previous contractor, including completing the demolition work, and particularly removing the remaining framing, poles, ducts, both side wings structure before actual construction work starts.' [¶] 'In order to avoid any further delay and to mitigate damages, the Owner has requested the Contractor to begin work without the Owner having secured the City of San Marino approval for the new modification and addition of the 614 sq. ft. per the set plan dated 1/2/08. The Contractor agrees to do his best to co-ordinate the technical procedures and scheduling of work to begin work within the perimeters of the first set of approved plans dated 11/28/06 pending the final approval of the new modifications.' [¶] Then continue with the rest, 'The Contractor has advised the Owner of the risk involved with this request . . . . [¶] . . . [¶] 4) Also, in the same paragraph A of Addendum 'A', please add the following to account for the basis of the total contract price and price

4

breakdown: [¶] The total contract price of $421,200.00 is based on all the requirements called for in the building plans dated 1/2/08, which incorporates the original plans dated 11/28/06. In addition, the total contract price is also based on the actual site inspection by the Contractor in the months of January and February, 2008. The Contractor noticed several discrepancy between the current job site situation and the requirements called for in the plans dated 11/28/06: [¶] Firstly, the plans did not call for extensive demolition of the dry wall in the living room facing Cumberland Road, those facing the back yard, and the side wing facing Gainsborough, for approximately _____ ft (insert number per knowledge). Additional dry walls need to be set up on top of what the plans specified. [¶] Secondly, the east side wing consisting of two bedrooms and one bathroom in between are supposed to stay intact per the plans. This side wing needs to be completely demolished and rebuilt due to water damages which will give rise to future mold problems if not replaced. [¶] Thirdly, the kitchen side wing only had frame structure remain (please add in your own description, such as from cost point of view, to explain the need of completely demolishing the remaining structure)[.] [¶] The need to remove the remaining structure per the above and to set up new framing and drywall was not intended or specified in the original set of plans dated 11/28/06 and the modifications plans dated 1/2/08, but rather, made necessary due to the actual site inspection."

On March 18, 2008, BBCI and plaintiffs entered into a "Contract Agreement" (BBCI Agreement) for "construction work" at plaintiffs' home. The BBCI Agreement provided, in part, "In order to avoid any further delay and to mitigate damages, the Owner has requested the Contractor to begin work on the Project without the Owner having secured City of San Marino approval on the modifications and additional 614 square feet contained in the Primary Set of Plans for this Project. The Owner has requested the Contractor to begin by first cleaning up the job site and picking up the remaining work left by the previous contractor. This includes completing the demolition work and particularly removing the remaining framing, plumbing, ducting, electrical, plaster and stucco on both remaining wings of the structure and what little remains of the main middle area of the structure. This work is to be completed before the actual build

5

back construction begins. The Contractor has advised the Owner of the risk involved with this request. The Owner accepts all liability and responsibility regarding this request. The owner will be solely financially responsible for any changes that may arise from the design process. The Contractor reserves the right to review whatever is changed from the bid set of plans that has been identified above and was the sole source of information used to compile all prices, allowances and ultimately this contract agreement. If upon completing their review of whatever is changed by the design process the Contractor feels the need to change any prices they will do so with an Extra Work Order (see item #9 in the Contract Agreement). The Owner agrees to pay for all additional work that the design procedure with the City of San Marino creates. Baker Brothers Construction, Inc. is not responsible for the financial or legal problems that may arise from the Owner's decision to begin work prior to the City of San Marino approval. Baker Brothers Construction, Inc. advice to the Owner is contrary to the Owner's final decision.

"[¶] . . . [¶]

"The Owner has requested the Contractor to begin work on the Project without the Owner having secured the City of San Marino approval. The Contractor has advised the Owner of the risk involved with this request. The Owner accepts all liability and responsibility regarding this request. The Owner will be solely financially responsible for any changes that may arise from the design process. The Contractor reserves the right to review whatever is changed from the bid set of plans that has been identified above and was the sole source of information used to compile all prices, allowances and ultimately this contract agreement. If upon completing their review of whatever is changed by the design process the Contractor feels the need to change any prices they will do so with an Extra Work Order (see item #9 in the Contract Agreement). The Owner agrees to pay for all additional work that the design procedure with the City of San Marino creates. Baker Brothers Construction, Inc. is not responsible for the financial or legal problems that may arise from the Owner's decision to begin work prior to the

6

City of San Marino approval. Baker Brothers Construction, Inc. advice to the Owner is contrary to the Owner's final decision."

The "Scope of Work" section in the BBCI Agreement provided:

"The job site condition was contrary to work required in the Original Set of Plans. The project had received more demolition than was required in the main middle area of the structure (living room). Framing, stucco, interior plaster, electrical, hardwood flooring and finish carpentry was removed that should have been left in place. Only a few floor joints remained in this main middle area. The east and west wings of the Project had received extensive water damage due to the fact that the roofing had been removed and insufficient or no temporary waterproofing had been installed to protect these areas. The water damage had ruined the interior plaster, the hardwood flooring, the electrical, cabinetry, finish cabinetry and paint. With mold and future health issues a concern, all of the problems above required more demolition. The need to remove what remains of the existing structure was never intended or specified in the Original Remodel Set of Plans. All of this increased scope of demolition is included in the Contractors complete scope of work even though it is not specified on any plans or documents."

The BBCI Agreement included the following provision regarding the "scope of work for the demolition phase of construction on this project" which provided, in part:

"<u>Complete the demolition on what remains of the house structure - $6,500.00</u>

"Includes and is limited to the following: Baker Brothers Construction, Inc. will be responsible for removing what remains of the house structure. This will include all stucco, siding plaster, drywall, framing, plumbing, electrical, flooring and roofing. The existing foundation will not be removed. It will be used to rebuild the house on as per your building plans. The garage will have the roofing and stucco only removed. New roofing and stucco will be installed to match the new finishes on the rebuilt residence at the appropriate time."

Work under the BBCI Agreement was to commence on March 20, 2008, and to be substantially completed on or before March 20, 2009. In response to an interrogatory, plaintiffs stated that BBCI conducted work on their property between March 20, 2008,

7

and March 26, 2008. They described the work as demolition of the remaining structure, which work was outside of the approved plans for their remodel.

BBCI hired subcontractor Pennhall Company to perform the demolition work referred to in the BBCI Agreement. On March 26, 2008, the City's Planning and Building Department issued a stop work order for plaintiffs' remodel. The stop work order stated, "No work beyond the scope of permitted remodel work is allowed. Obtain addition permits for demo and nearly complete new structure. This notice shall act as a Stop Work Order for all unpermitted activities on site. Clean Street. Note: Only foundation remains." As of the date of the stop work order, plaintiffs' house had been demolished down to the foundation. According to Mrs. Hollingsworth, in April 2008, Curtis acknowledged to plaintiffs that he did not check with the City before demolishing the remainder of their house because he believed the existing permit covered the demolition work.

According to plaintiffs, after the City issued the stop work order, it voided the previously approved building permit for plaintiffs' remodel and required plaintiffs to submit new plans for new construction rather than for a remodel. That is, because the entire house had been demolished, the remodel project was no longer an addition to an existing structure, but the construction of a new house.

On September 4, 2008, plaintiffs faxed a letter to BBCI that stated that they "declared rescinded and terminated" the BBCI Agreement. On February 24, 2009, BBCI filed a complaint for breach of written contract, quantum meruit, and unjust enrichment against plaintiffs in the BBCI Action. BBCI alleged, among other things, that plaintiffs failed to pay for lumber that had been delivered to their house for the remodel.

On April 23, 2009, plaintiffs filed a cross-complaint for negligence and breach of contract against BBCI. The cross-complaint alleged, "As a result of the damage caused by JCC and the unapproved demolition performed by Baker Bros., [plaintiffs'] family home has now been reclassified from a remodel to new construction. The new classification means that the new construction must comply with current setback requirements, which will result in [plaintiffs] having to demolish and rebuild the only

8

portions of their original home that still exist—the . . . 4 car garage, and the circular driveway . . . ."

In the negligence cause of action, the cross-complaint alleged, among other things, that BBCI breached its duty to exercise ordinary care and skill in performing its construction work on the remodel by "negligently advising [plaintiffs] to proceed with the demolition of the structures all at one time, contrary to the plans and specifications, the existing building permit, and City building ordinances, codes, and policies, contrary to the contract documents." It further alleged that BBCI negligently failed to advise plaintiff of the potential consequences of demolishing their house all at once contrary to the building plans, the City permit, and City building ordinances; negligently failed to coordinate demolition of the house with the City; and failed to cancel the lumber order.

In their breach of contract cause of action, the cross-complaint alleged, among other things, that the BBCI Agreement "required [BBCI] to perform its work in accordance with the plans and specifications and the existing building permit, and to coordinate with and obtain approval for all of its work by the relevant governmental authorities, including the City of San Marino." BBCI breached the BBCI Agreement, the cross-complaint alleged, when it "performed complete demolition of the entire remaining structures at one time contrary to the plans and specifications and the building permit, and without consulting with or coordinating with the City prior to doing so. Furthermore, [BBCI] failed to subsequently cancel the lumber order and reverse the lumber charges, contrary to their agreement to do so."

BBCI tendered the defense and indemnity of plaintiffs' cross-complaint to Lincoln under its commercial general liability policy (policy number 6350001737 (Lincoln Policy)). Pursuant to the Lincoln Policy, Lincoln agreed to "pay those sums" that BBCI becomes "legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." The insurance applied to "property damage" caused by an "occurrence." The policy defined an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage" was defined as "a. Physical injury to tangible property, including all resulting

9

loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or [¶] b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

On August 12, 2009, Lincoln declined the tender of the defense and indemnity of plaintiffs' cross-complaint against BBCI asserting that there was "no possibility for coverage under the policy." Lincoln's stated reasons were that the "demolition of [plaintiffs'] residence did not result from an 'occurrence' under the policy, and even if the unintended reclassification of the reconstruction project somehow constituted an 'occurrence,' the resulting damages flowing from the reclassification do no[t] involve any covered 'property damage' under the policy." Plaintiffs' claim for loss of use of their house was precluded by the policy's Impaired Property exclusion.

In June 2010, plaintiffs and BBCI settled the BBCI Action. As part of the settlement, BBCI assigned to plaintiffs its rights under the Lincoln Policy and any cause of action it had against Lincoln or any other insurer or insurance broker based on the failure to defend and indemnify BBCI or to provide BBCI with insurance BBCI requested or that was adequate to meet BBCI's needs. The BBCI Action was dismissed with prejudice.

On July 26, 2010, plaintiffs filed the Coverage Action against Lincoln and Powers concerning insurance coverage issues in the BBCI Action. As against Lincoln, the complaint in the Coverage Action asserted causes of action for breach of contract, breach of the covenant of good faith and fair dealing, and fraud. On November 9, 2010, plaintiffs filed a first amended complaint in the Coverage Action. In the first amended complaint, plaintiffs' breach of contract cause of action against Lincoln alleged, in part, that under the terms of the Lincoln Policy, Lincoln had a duty to defend and indemnify BBCI in the BBCI Action which duty it violated when it denied coverage. The breach of the implied covenant of good faith and fair dealing cause of action alleged, in part, that Lincoln wrongfully refused to defend BBCI in the BBCI Action, and "unreasonably and narrowly interpreted the Policies in a manner calculated to deny benefits." The trial court

10

granted Lincoln's motion to strike plaintiffs' punitive damages claim in connection with the breach of the covenant of good faith and fair dealing.

Plaintiffs' fraud cause of action alleged, in part, that Lincoln represented to BBCI, plaintiffs, and the general public that they provided full and complete insurance coverage for contractors in California. Such representations were made through advertisements, the media, and publications to BBCI including a certificate of liability insurance Lincoln provided to BBCI that Lincoln "knew or should have known would be provided by [BBCI] to its customers or potential customers, including the Plaintiffs herein, with the purpose of providing evidence that [BBCI] carried commercial general liability insurance. The certificate specifically stated that Plaintiffs were the 'certificate holder.' The certificate stated that [BBCI] was covered by 'commercial general liability' insurance, by which statement [Lincoln] intended to convey to [BBCI] and the general public the representation that [Lincoln] had agreed to provide commercial general liability insurance as commonly understood, which would provide coverage for the claims made in [the BBCI Action]." The representations were knowingly false, and Lincoln did not intend to defend or indemnify BBCI for claims arising from BBCI's negligence, including for plaintiffs' claims in the BBCI Action. Based on the false representations, the cause of action alleged, plaintiffs contracted with BBCI for construction work on their home. The trial court granted Lincoln's motion to strike plaintiffs' punitive damages claim in connection with the breach of the covenant of good faith and fair dealing cause of action. The trial court sustained without leave to amend Lincoln's demurrer to plaintiffs' fraud cause of action and ruled that Lincoln's motion to strike the claim for punitive damages on the fraud cause of action thus was moot.

With respect to their remaining causes of action against Lincoln, plaintiffs described in discovery responses the "property damage" they claimed the Lincoln Policy covered as "the demolition by BBC of all the remaining structure on Plaintiffs' property . . . which work was outside of the approved plans for the remodeling of the property." In another discovery response, plaintiffs described the "property damage" that they contended was "a result of an OCCURRENCE relating to any WORK performed by

11

BBCI at the PROPERTY" as "[d]emolition of all the remaining structure on Plaintiffs' property . . . which work was outside of the approved plans for the remodel of Plaintiffs' property." In response to additional discovery, plaintiffs stated that Lincoln had a duty to defend BBCI, in part, because BBCI breached the BBCI Agreement by advising plaintiffs that demolition was a standard procedure in construction that the City did not have to approve, by demolishing the remainder of plaintiffs' house without City approval, by not following the two sets of plans referred to in the BBCI Agreement, and by negligently performing work on plaintiffs' property that was not in compliance with the two set of plans and not approved by the City.

### B.     Procedural Background

Lincoln moved for summary judgment or summary adjudication of plaintiffs' breach of contract and breach of the covenant of good faith and fair dealing causes of action on the grounds that the causes of action had no merit as there was no property damage caused by an occurrence and thus no potential for coverage under the Lincoln Policy, and because the causes of action came within the scope of the policy's Work Product and Impaired Property exclusions. The trial court granted Lincoln's motion on the grounds asserted.

## II.     Facts Underlying Powers's Summary Judgment Motion

### A.     Factual Background

Powers procured a commercial general liability policy for BBCI from Lincoln (policy number 6340001714) and assisted BBCI in renewing that policy (renewed policy number 6350001737 (Lincoln Policy)) prior to October 2007. The policy period for the Lincoln Policy was October 15, 2007, to October 15, 2008. According to Julie, BBCI did not request that Powers procure an insurance policy that provided coverage for "all claims that could be made as a result of BBCI's construction operations." Powers never told Julie that under the policies it obtained for BBCI "everything would be covered," or that "the Policy would provide full coverage for all claims made for damages occurring

12

during BBCI's construction operations." Powers never told Curtis that the Lincoln Policy "would provide full coverage for all claims made for damages occurring in [his] construction business."

The Lincoln Policy was issued before Curtis met plaintiffs. Neither Julie nor Curtis spoke with Powers about the need for insurance for plaintiffs' house remodel. When Curtis received the Lincoln Policy, he read it and did not tell Powers that "there was anything in the policy that was not as [he] had requested." To the best of his knowledge, Curtis believed that the Lincoln Policy was the same policy that BBCI had always had, although he did not compare the Lincoln Policy with the prior policy. According to Curtis, because the Lincoln Policy contained more exclusions than "inclusions," "we" typically read the exclusions to make sure that BBCI was not going to be engaged in work covered by an exclusion, and "we" were able to understand the exclusions.

Pursuant to the BBCI Agreement, BBCI was to procure and maintain certain insurance, including commercial general liability insurance. In a declaration, Mrs. Hollingsworth stated that Curtis told plaintiffs that "his liability insurance policy would cover anything that went wrong in the project." He never described to plaintiffs the circumstances that the Lincoln Policy would not cover. Curtis told Mrs. Hollingsworth that he would have his insurance broker send plaintiffs a "Certificate of General Liability Insurance" to prove coverage and that plaintiffs' names "as owners of the property" would be listed on the certificate as "third party beneficiaries" under the policy.

BBCI provided to plaintiffs a Certificate of Liability Insurance.[3] Plaintiffs were identified on the certificate as "Certificate Holder[s]." The certificate stated, "This certificate is issued as a matter of information only and confers no rights upon the certificate holder. This certificate does not amend, extend or alter the coverage afforded by the policies below." The certificate included a "Disclaimer" that provided, "The

---

**3** Although plaintiffs' claim, based on Mrs. Hollingsworth's declaration, that they received the Certificate of Liability Insurance shortly before the Contract Agreement was signed on March 18, 2008, the certificate is dated March 26, 2008.

13

Certificate of Insurance on the reverse side of this form does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed thereon."

Lincoln denied a defense or indemnity to BBCI for plaintiffs' cross-complaint in the BBCI Action. On June 17, 2010, as part of a settlement of plaintiffs' cross-action against BBCI, BBCI assigned to plaintiffs all of its rights against Lincoln and any insurance broker that procured insurance coverage for BBCI "in connection with the failure and refusal to defend and indemnify [BBCI]" in plaintiffs' cross-action.

In the Coverage Action, the first amended complaint asserted causes of action for breach of contract and negligence against Powers. Plaintiffs' breach of contract cause of action alleged that "Prior to the issuance of the [Lincoln] Policy as alleged herein, [BBCI] specifically advised Powers . . . that [BBCI] sought insurance coverage that would insure and indemnify [BBCI] against any and all liability that [BBCI] may incur during the operation of [BBCI]'s construction business, including insurance coverage that would cover the claims made in the [BBCI] Action." Powers "agreed to obtain insurance coverage which met those needs" and advised BBCI that it had obtained such coverage. Powers breached its agreement because the Lincoln Policy did not provide the insurance coverage BBCI requested. Plaintiffs' negligence cause of action against Powers alleged that Powers breached its duty to use reasonable care in procuring the type of coverage that BBCI requested—i.e, an "insurance policy which would defend and indemnify [BBCI] against all claims made as a result of [BBCI]'s construction operations . . . ."

B. *Procedural Background*

Powers moved for summary judgment of plaintiffs' breach of contract and negligence causes of action on the ground that plaintiffs could not show that Powers, as BBCI's insurance broker, failed to obtain the insurance coverage that BBCI requested. The trial court granted the motion.

14

## DISCUSSION

**I.** **Lincoln's Summary Judgment Motion**

Plaintiffs argue that the trial court erred in granting Lincoln's motion for summary judgment. The trial court did not err.**4**

### A. *Standard of Review and Rule of Interpretation*

 ""When determining whether a particular policy provides a potential for coverage . . . , we are guided by the principle that interpretation of an insurance policy is a question of law. [Citation.]" [Citation.]' (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390 [33 Cal.Rptr.3d 562, 118 P.3d 589].) '"We apply a de novo standard of review to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy." [Citations.]' (*Ibid.*)" (*Federal Ins. Co. v. Steadfast Ins. Co.* (2012) 209 Cal.App.4th 668, 679.)

"'In reviewing de novo a superior court's summary adjudication order in a dispute over the interpretation of the provisions of a policy of insurance, the reviewing court applies settled rules governing the interpretation of insurance contracts . . . . [¶] '"While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' [Citations.] 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citation.] 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citation.] 'If contractual language is clear and explicit, it governs.' [Citation.]" [Citation.]' (*Powerine Oil Co., Inc. v. Superior Court, supra,* 37 Cal.4th at p. 390, accord, *TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19,

---

**4**     Because we hold that BBCI's conduct was not accidental and thus not an "occurrence" under the Lincoln Policy, we need not decide whether the trial court properly granted summary judgment under the policy's Work Product and Impaired Property exclusions. (See *F & H Construction v. ITT Hartford Ins. Co.* (2004) 118 Cal.App.4th 364, 373 [CGL policy in that case does not cover errors and omissions in workmanship].)

15

27 [50 Cal.Rptr.3d 597, 145 P.3d 472].)"  (*Federal Ins. Co. v. Steadfast Ins. Co., supra,* 209 Cal.App.4th at p. 679.)


B.     *Application of Relevant Principles*

"[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity."  (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081.)  Whether an insurer owes its insured a duty to defend is made, in the first instance, by comparing the allegations in the complaint with the policy's terms.  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 26.)  If there is no potential for coverage under an insurance policy's terms, an insurer acts properly in denying a defense.  (*Ibid.*)  If there is any doubt about whether there is a duty to defend, the matter is resolved in the insured's favor.  (*Horace Mann Ins. Co. v. Barbara B., supra,* 4 Cal.4th at p. 1081.)  The duty to defend is broader than the duty to indemnify.  (*Ibid.*)  An insurer's duty to indemnify extends to claims that are actually covered by the policy.  (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 45-46; *Risely v. Interinsurance Exchange of the Automobile Club* (2010) 183 Cal.App.4th 196, 208.)  The duty to indemnify arises only after liability has been established.  (*Buss v. Superior Court, supra,* 16 Cal.4th at p. 46.)

An assignee of an insured's rights under an insurance policy stands in the shoes of the insured and is subject to any defenses the insurer could have asserted against the insured.  (*Smith v. State Farm Mut. Auto. Ins. Co.* (1992) 5 Cal.App.4th 1104, 1111; *Woolett v. American Employers Ins. Co.* (1978) 77 Cal.App.3d 619, 625.)  Thus, as BBCI's assignees, plaintiffs stand in the shoes of BBCI and are subject to any defenses that Lincoln could have asserted against BBCI.  (*Smith v. State Farm Mut. Auto. Ins. Co., supra,* 5 Cal.App.4th at p. 1111; *Woolett v. American Employers Ins. Co., supra,* 77 Cal.App.3d at p. 625.)

The Lincoln Policy obligated Lincoln to "pay those sums" that BBCI became "legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies."  The insurance applied to "property damage" caused by an

16

"occurrence." Under the policy, an "occurrence" was "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The term "accident" in an insurance policy "is given a commonsense interpretation that it is an unintentional, unexpected, chance occurrence. [Citation.] [¶] An accident does not occur when the insured performs a deliberate act unless some additional, unexpected, independent, and unforeseen happening occurs that produces the damage. [Citation.] [¶] Where the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an 'accident' merely because the insured did not intend to cause injury." (*Fire Ins. Exchange v. Superior Court* (2010) 181 Cal.App.4th 388, 392.) "[A]n injury-producing event is not an 'accident' within the policy's coverage language when all of the acts, the manner in which they were done, and the objective accomplished occurred as intended by the actor." (*Delgado v. Interinsurance Exchange of Automobile Club of Southern California* (2009) 47 Cal.4th 302, 311-312.)

The trial court did not err in finding that the demolition of the remaining parts of plaintiffs' house was not an "accident" within the meaning of Lincoln Policy. In their March 13, 2008, fax to Curtis, plaintiffs specifically requested that the final BBCI Agreement state that the remainder of plaintiffs' house was to be demolished and that such demolition was not called for in the Original or Revised Plans. The final BBCI Agreement provided that plaintiffs requested that BBCI demolish the remainder of plaintiffs' house before plaintiffs obtained City approval of the Revised Plans. The agreement expressly acknowledged that BBCI advised plaintiffs of the risk involved in plaintiffs' request, and that plaintiffs accepted "all liability and responsibility" for their request. Pursuant to the agreement, BBCI was "not responsible for the financial or legal problems that may arise from [plaintiffs'] decision to begin work prior to the City of San Marino approval." The agreement further provided, "The need to remove what remains of the existing structure was never intended or specified in the Original Remodel Set of Plans. All of this increased scope of demolition is included in [BBCI's] complete scope of work even though it is not specified on any plans or documents."

17

These provisions in the BBCI Agreement indisputably establish that plaintiffs retained BBCI in part to demolish the remainder of their house, that BBCI intended to demolish the remainder of the house, and that such demolition thus was not an "accident" within the provisions of the Lincoln Policy. (*Delgado v. Interinsurance Exchange of Automobile Club of Southern California, supra,* 47 Cal.4th at pp. 311-312; *Fire Ins. Exchange v. Superior Court, supra,* 181 Cal.App.4th at p. 392.) Accordingly, because there was no "accident" under the Lincoln Policy's provisions and no potential for coverage, Lincoln properly denied BBCI a defense and indemnity in the BBCI Action. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 26; *Buss v. Superior Court, supra,* 16 Cal.4th at p. 46; *Risely v. Interinsurance Exchange of the Automobile Club, supra,* 183 Cal.App.4th at p. 208.)

Plaintiffs contend that demolition not in accordance with the approved plans was never intended. They argue that the resulting stop work order, order for new construction, and loss of "grandfathering benefits" were unexpected injuries resulting from BBCI's demolition. Thus, plaintiffs conclude, BBCI's demolition was an "accident" under the Lincoln Policy. Plaintiffs are mistaken. The BBCI agreement plainly demonstrates that plaintiffs and BBCI intended to demolish the remainder of plaintiffs' house even though such demolition was not in accordance with the approved plans, the agreement providing, "The need to remove what remains of the existing structure was never intended or specified in the Original Remodel Set of Plans. All of this increased scope of demolition is included in [BBCI's] complete scope of work even though it is not specified on any plans or documents." Moreover, in deciding whether the demolition was an "accident" we look to the insured's acts and not the resulting injury. (*Fire Ins. Exchange v. Superior Court, supra,* 181 Cal.App.4th at p. 392 ["Where the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an 'accident' merely because the insured did not intend to cause injury"]; *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 750 ["[T]he term 'accident' does not apply to an act's consequences, but instead applies to the act itself. [Citation.]]; *Quan v. Truck Ins. Exchange* (1998) 67 Cal.App.4th 583, 596 ["'An

intentional act is not an "accident" within the plain meaning of the word. [Citations.] The same roadblock at the definition of "accident" halts any argument claiming the [insured] intended his act but not the resulting harm.' [Citation.]"].)

## II.     Lincoln's Demurrer to Plaintiffs' Fraud Cause of Action

Plaintiffs contend that the trial court erred in sustaining without leave to amend Lincoln's demurrer to their fraud cause of action.[5] The trial court properly sustained the demurrer.

### A.     Standard of Review

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. We give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].) Further, we treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law. (*Ibid.*; *Aubry v. Tri–City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317] (*Aubry*).) When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. (*Zelig, supra,* 27 Cal.4th at p. 1126.) And when it is sustained without leave to amend, we decide whether there is a reasonable

---

**5**      Plaintiffs also perfunctorily argue that they were "entitled to plead punitive damages." It appears that this argument is made with respect to their claim for punitive damages in connection with their fraud cause of action—they did not oppose Lincoln's motion to strike the punitive damages claim with respect to plaintiffs' breach of the covenant of good faith and fair dealing cause of action, and the argument is a subpart of plaintiffs' argument that the trial court erred in sustaining Lincoln's demurrer. As noted above, the trial court did not rule on Lincoln's motion to strike the claim for punitive damages on plaintiffs' fraud cause of action because its ruling sustaining Lincoln's demurrer to that cause of action rendered the issue moot. Because we hold that the trial court properly sustained Lincoln's demurrer, we need not address the sufficiency of plaintiffs' accompanying claim for punitive damages. (See *Essex Ins. Co. v. Five Star Dye House, Inc.* (2006) 38 Cal.4th 1252, 1263 [punitive damage claim not assignable].)

19

possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse. (*Ibid.*)" (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.)

### B. Plaintiffs' Allegations

In their fraud cause of action, plaintiffs alleged that Lincoln represented to BBCI, through advertisements, the media, and publications, that it provided full and complete insurance coverage to contractors. Specifically, plaintiffs alleged that Lincoln provided to BBCI the certificate of liability insurance that Lincoln "knew or should have known would be provided by [BBCI] to its customers or potential customers, including the Plaintiffs herein, with the purpose of providing evidence that [BBCI] carried commercial general liability insurance. The certificate specifically stated that Plaintiffs were the 'certificate holder.' The certificate stated that [BBCI] was covered by 'commercial general liability' insurance, by which statement [Lincoln] intended to convey to [BBCI] and the general public the representation that [Lincoln] had agreed to provide commercial general liability insurance as commonly understood, which would provide coverage for the claims made in [the BBCI Action]." Plaintiffs alleged that the representations were knowingly false, and Lincoln did not intend to defend or indemnify BBCI for claims arising from BBCI's negligence, including for plaintiffs' claims in the BBCI Action. If plaintiffs knew the truth—i.e., that Lincoln would not defend or indemnify BBCI, they would not have contracted with BBCI for construction work on their home.

### C. Application of Relevant Principles

"'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.]" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) "In California, fraud must be pled specifically; general and conclusory allegations do not suffice. (*Stansfield v. Starkey* (1990) 220 Cal.App.3d 59, 74 [269 Cal.Rptr. 337];

20

*Nagy v. Nagy* (1989) 210 Cal.App.3d 1262, 1268 [258 Cal.Rptr. 787]; 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 662, pp. 111–112.)  'Thus "'the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect.'" [Citation.]  [¶]  This particularity requirement necessitates pleading *facts* which show how, when, where, to whom, and by what means the representations were tendered.' (*Stansfield, supra,* 220 Cal.App.3d at p. 73, italics in original.)" (*Id.* at p. 645.)

A certificate or verification of insurance is provided as evidence of insurance in lieu of an actual copy of an insurance policy.  (See Ins. Code, § 384, subd. (a).)  That is, "[a] certificate of insurance is merely evidence that a policy has been issued.  (Ins. Code, § 384.)  It is not a contract between the insurer and the certificate holder.  [Citations.])" (*Empire Fire & Marine Ins. Co. v. Bell* (1997) 55 Cal.App.4th 1410, 1423, fn. 25.) Because a certificate of insurance is merely evidence that an insurance policy has been issued, and plaintiffs' first amended complaint alleged that Lincoln issued to BBCI the liability insurance policy identified in the certificate of liability insurance, the certificate of liability insurance, by plaintiffs' own allegations, did not contain a misrepresentation. (*Ibid.*)  Accordingly, the trial court did not err in sustaining Lincoln's demurrer.

Plaintiffs do not argue that their non-specific allegations that Lincoln made representations to BBCI through advertisements and the media about the insurance coverage it provided for contractors stated a cause of action for fraud independent from their fraud claim based on the representations in the certificate of insurance. (*Lazar v. Superior Court, supra,* 12 Cal.4th at p. 645.)  Nor do plaintiffs claim that they can amend their fraud cause of action to cure its defects.  (*City of Dinuba v. County of Tulare, supra,* 41 Cal.4th at p. 865.)

### III.    Powers's Summary Judgment Motion

Plaintiffs argue that the trial court erred in granting Powers's summary judgment motion because they established that they were third party beneficiaries of the Lincoln Policy, there was a factual dispute about whether Powers explained and BBCI understood

21

the exclusions in the Lincoln Policy, the Lincoln Policy was not a "genuine" liability policy, and Powers admitted that plaintiffs were additional insureds under the Lincoln Policy. The trial court did not err.

### A. Third Party Beneficiaries

Plaintiffs contend that the trial court erred in disregarding their status as third party beneficiaries. They cite *Business to Business Markets, Inc. v. Zurich Specialties London Limited* (2005) 135 Cal.App.4th 165, 168-169 (*Business to Business*), for the proposition that Powers owed them a duty of care to procure insurance that adequately protected BBCI. Plaintiffs' reliance is misplaced.

In *Business to Business, supra,* 135 Cal.App.4th 165, Business to Business Markets, Inc. (B2B) hired Tricon Infotech (Tricon), a software company in India, to write a computer program for B2B's business. (*Id.* at p. 167.) The contract required Tricon to carry an errors and omissions insurance policy to compensate B2B if Tricon did not deliver usable software. (*Ibid.*) B2B contacted Hoyla, an insurance broker, and informed it of Tricon's insurance needs. (*Ibid.*) B2B told Hoyla that Tricon was based in India. (*Ibid.*)

Hoyla contacted Professional Liability Insurance Services, Inc. (PLIS) to place the insurance policy and provided PLIS with the information it had received from B2B. (*Business to Business, supra,* 135 Cal.App.4th at p. 167.) PLIS contacted Zurich Specialties London Limited (Zurich Specialties), which issued an insurance policy to Tricon that contained a coverage exclusion for claims that arose or related to work performed in India. (*Ibid.*) B2B sued Tricon when Tricon failed to deliver usable software. (*Id.* at p. 168.) Zurich Specialties refused to pay for Tricon's defense or to indemnify Tricon against B2B's claim based on the policy exclusion for work done in India. (*Ibid.*)

Tricon defaulted in B2B's action, and a judgment of $922,480 was entered against it. (*Business to Business, supra,* 135 Cal.App.4th at p. 168.) Without insurance coverage, B2B's judgment against Tricon was uncollectible, and B2B sued PLIS for

negligence in procuring a policy that did not cover work done in India. (*Ibid.*) The trial court sustained PLIS's demurrer without leave to amend on the ground that PLIS had no direct dealings with B2B and did not owe it a duty of care. (*Ibid.*)

PLIS appealed, and the court of appeal reversed. (*Business to Business, supra,* 135 Cal.App.4th at p. 168.) In deciding whether PLIS owed a duty of care to B2B even though they had no direct contact with each other, were not in privity of contract, and B2B was not named on the insurance policy, the court of appeal considered the following factors: (1) the extent to which the transaction was intended to affect B2B, (2) the foreseeability of harm to B2B, (3) the degree of certainty that B2B suffered injury, (4) the moral blame attached to PLIS's conduct, and (5) the policy of preventing future harm. (*Ibid.*)

*Business to Business, supra,* 135 Cal.App.4th 165 is distinguishable from the case before us on the first, essential factor. In *Business to Business*, the insurance policy was acquired specifically to protect the interests of an identified third party—B2B—against an indentified risk—Tricon's failure to deliver usable software. In the instant case, the insurance policy Powers obtained for BBCI was not obtained to protect the interests of identified third parties—plaintiffs—against an identified risk—damages resulting from BBCI's work on plaintiffs' remodel. Instead, Powers simply renewed BBCI's existing liability insurance policy several months before BBCI even had contact with plaintiffs. Accordingly, plaintiffs have not established that they are third party beneficiaries under the Lincoln policy.

Moreover, if meritorious, plaintiffs' third party beneficiary argument would not require reversal of the judgment in Powers's favor. Powers owed BBCI a duty of care in procuring the insurance BBCI requested. (*Travelers Property Casualty Co. of America v. Superior Court* (2013) 215 Cal.App.4th 561, 578.) BBCI assigned to plaintiffs its rights against Powers. As BBCI's assignees, plaintiffs stand in the shoes of BBCI (*Cates v. Chiang* (2013) 213 Cal.App.4th 791, 825) and thus can recover for Powers's breach of its duty of care, if any. Plaintiffs fail to explain how any right to recover they claim they

23

have against Powers is different if they prosecute the action as third party beneficiaries rather than as assignees.

### B. *The Lincoln Policy Exclusions*

Plaintiffs contend that the trial court ignored the factual dispute about whether Powers explained and BBCI understood the exclusions in the Lincoln Policy. That is, the trial court ignored Curtis's deposition testimony that when BBCI received a new insurance policy he read the exclusions to make sure that BBCI was not going to be engaged in work covered by an exclusion. Such testimony, plaintiffs contend, is inconsistent with an understanding of the exclusions in the Lincoln Policy, which the trial court found applied to the claims in the BBCI Action. That is, according to plaintiffs, if Curtis understood that the exclusions would apply to his work on plaintiffs' remodel, he would have had Powers procure different insurance. The trial court did not ignore the evidence concerning the knowledge of the Lincoln Policy exclusions.

Plaintiffs in their breach of contract cause of action against Powers alleged that BBCI told Powers that it sought insurance coverage that would indemnify it against "against any and all liability" it might incur during the operation of its construction business including coverage for the claims plaintiffs made in the BBCI Action. They alleged that Powers agreed to obtain, and told BBCI that it had obtained, such coverage and breached its agreement by failing to obtain the coverage BBCI requested. Plaintiffs' negligence cause of action against Powers also relied on Powers' asserted failure to obtain the "all claims made" insurance BBCI allegedly requested.

The trial court granted Powers's summary judgment motion on the ground that plaintiffs could not show and did not show that Powers did not obtain for BBCI the scope of coverage it requested. That is, BBCI asked Powers to obtain general liability insurance, it did not ask Powers to procure insurance that would cover any and all claims of liability, and Powers never told BBCI that it would procure a policy that provided full coverage for all damages that occurred during BBCI's construction business. BBCI knew that the policy Powers procured did not cover every kind of claim—i.e., that the

24

policy contained exclusions. Plaintiffs' evidence did not create a triable issue of fact about whether Powers procured the requested insurance.

### C.      Powers's Failure to Obtain a "Genuine" Liability Policy

Plaintiffs contend that Powers failed to obtain a "genuine" liability policy. Plaintiffs' contention is unclear and appears to be a restatement of its argument that Powers did not advise BBCI about the exclusions in the Lincoln Policy. To the extent that plaintiffs claim that the Lincoln Policy is not a real insurance policy, the claim fails because plaintiffs have raised it for the first time on appeal. (*Baugh v. Garl* (2006) 137 Cal.App.4th 737, 746.)

### D.      Powers's "Admission" that Plaintiffs Were Additional Insureds Under the Lincoln Policy

Plaintiffs note that Powers stated in opposition to a discovery motion, "Simply put, Powers has admitted that it issued a Certificate of Insurance which showed Plaintiffs as an additional insured on Baker Brothers' insurance policy." Powers states that its counsel made a mistake when responding to the discovery. Plaintiffs do not explain the import of Powers's statement. Contrary to plaintiffs' assertion, the Certificate of Liability Insurance does not indicate that they are "third party beneficiaries," and contrary to Powers's discovery response, the Certificate of Insurance does not establish plaintiffs as "additional insured[s]." As we explained above, "[a] certificate of insurance is merely evidence that a policy has been issued. (Ins. Code, § 384.) It is not a contract between the insurer and the certificate holder. [Citations.])" (*Empire Fire & Marine Ins. Co. v. Bell, supra,* 55 Cal.App.4th at p. 1423, fn. 25.)

## IV.      Plaintiffs' Discovery Motions

Plaintiffs contend that the trial court erred in denying four motions to compel additional discovery responses from Lincoln. Because plaintiffs failed on appeal to

25

present a cogent factual and legal analysis of their contention, we deem this contention forfeited.

"The burden of affirmatively demonstrating error is on the appellant. This is a general principle of appellate practice as well as an ingredient of the constitutional doctrine of reversible error. [Citation.]" (*Fundamental Investment etc. Realty Fund v. Gradow* (1994) 28 Cal.App.4th 966, 971.) "An appellant must provide an argument and legal authority to support his contentions. This burden requires more than a mere assertion that the judgment is wrong. 'Issues do not have a life of their own: If they are not raised or supported by argument or citation to authority, [they are] . . . waived.' [Citation.] It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness. When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852; *People Ex Rel. Dept. of Alcoholic Beverage Control v. Miller Brewing Co.* (2002) 104 Cal.App.4th 1189, 1200 ["It is an established rule of appellate procedure that an appellant must present a factual analysis and legal authority on each point made or the argument may be deemed waived. [Citations.]"].)

Plaintiffs filed four motions to compel numerous supplemental responses to discovery. The trial court denied the motions. Plaintiffs' argument on appeal consists essentially of a compilation of short notations about the propounded discovery. The argument is factually incomprehensible and relies on almost no legal authority or analysis. Moreover, the argument fails to explain how any of the discovery sought is relevant to the issue upon which we affirmed Lincoln's summary judgment—i.e., BBCI's demolition of the remaining parts of plaintiffs' house was not covered by the Lincoln Policy because the policy did not provide coverage for intentional acts. Accordingly, plaintiffs have not met their burden on appeal of demonstrating error (*Fundamental Investment etc. Realty Fund v. Gradow, supra,* 28 Cal.App.4th at p. 971), and have forfeited review of this contention (*Benach v. County of Los Angeles, supra,* 149

26

Cal.App.4th at p. 852; *People ex rel. Dept. of Alcoholic Beverage Control v. Miller Brewing Co., supra,* 104 Cal.App.4th at p. 1200).

## DISPOSITION

The judgments are affirmed.  Lincoln and Powers are awarded their costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, Acting P. J.


We concur:


KRIEGLER, J.


KUMAR, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.